1   **BERNS WEISS LLP**
    Jeffrey K. Berns (SBN 131351)
2   jberns@law111.com
    20700 Ventura Blvd. Suite 140
3   Woodland Hills, CA 91364
    Telephone: (818) 961-2000
4   Facsimile: (818) 999-1500

5

6   *Attorneys for Plaintiffs*

**BERNS WEISS LLP**
Lee A. Weiss
(*pro hac vice* application forthcoming)
lweiss@bernsweiss.com
626 RXR Plaza
Uniondale, NY 11556
Telephone: (516) 222-2900
Facsimile: (818) 999-1500

ORIGINAL
FILED

DEC - 7 2012

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

7                  UNITED STATES DISTRICT COURT

8                 NORTHERN DISTRICT OF CALIFORNIA

9   JENNIFER MURPHY; RICHARD D'ALESSIO;      CASE NO.        6228
10  CHAN C. PHARN; CHRISTINA ZAKO; PAUL
    MCDERMED; JULIE MCDERMED; THOMAS         **CLASS ACTION COMPLAINT**
11  GEREMIA; LINDA GEREMIA; JULIE A. YOUNG;
    DAVID W. YOUNG; MICHAEL LERNER; KATHY
12  LERNER; OMAR F. BISHR; RUTH M. BISHR;    **DEMAND FOR JURY TRIAL**
13  JEFF CORY; JOSE CRUZ; CYNTHIA BIGGS;
    GEORGE BIGGS; JASON FISHER; CATHERINE    HRL
14  MARSH; WALTER FALKOWSKI; MARY SLADE;
    GREG SLADE; JOSEPH MIDGETTE; NATHAN
15  RANGER; SHERRI GOLDFINCH; CARRIE
    ROSILLO; JOHN BURKETT; DIANA BURKETT;
16  CARLTON HINKLE; AND KATHERYN HINKLE,
17  Individually and on Behalf of All Others Similarly
    Situated,
18
19                              Plaintiffs,
                    v.
20
    WELLS FARGO HOME MORTGAGE; WELLS
21  FARGO BANK N.A.; WORLD SAVINGS, INC.;
    WORLD SAVINGS BANK, FSB; WACHOVIA
22  MORTGAGE, FSB, NOW KNOWN AS
    WACHOVIA MORTGAGE, A DIVISION OF
23  WELLS FARGO BANK, N.A.; WACHOVIA
    CORPORATION; GOLDEN WEST FINANCIAL
24  CORPORATION; WACHOVIA BANK, FSB,
    FORMERLY KNOWN AS WORLD SAVINGS
25  BANK, FSB TX; and WACHOVIA MORTGAGE
26  CORPORATION;
27                              Defendants.
28

_____
CLASS ACTION COMPLAINT

Plaintiffs JENNIFER MURPHY; RICHARD D'ALESSIO; CHAN C. PHARN; CHRISTINA ZAKO; PAUL MCDERMED; JULIE MCDERMED; THOMAS GEREMIA; LINDA GEREMIA; JULIE A. YOUNG; DAVID W. YOUNG; MICHAEL LERNER; KATHY LERNER; OMAR F. BISHR; RUTH M. BISHR; JEFF CORY; JOSE CRUZ; CYNTHIA BIGGS; GEORGE BIGGS; JASON FISHER; CATHERINE MARSH; WALTER FALKOWSKI; MARY SLADE; GREG SLADE; JOSEPH MIDGETTE; NATHAN RANGER; SHERRI GOLDFINCH; CARRIE ROSILLO; JOHN BURKETT; DIANA BURKETT; CARLTON HINKLE; AND KATHERYN HINKLE, individually and on behalf of all others similarly situated, by and through their undersigned counsel, for their Complaint against Defendants WELLS FARGO HOME MORTGAGE; WELLS FARGO BANK, N.A.; WORLD SAVINGS, INC.; WORLD SAVINGS BANK, FSB; WACHOVIA MORTGAGE, FSB, NOW KNOWN AS WACHOVIA MORTGAGE, A DIVISION OF WELLS FARGO BANK, N.A.; WACHOVIA CORPORATION; GOLDEN WEST FINANCIAL CORPORATION; WACHOVIA BANK, FSB, FORMERLY KNOWN AS WORLD SAVINGS BANK, FSB TX; WACHOVIA MORTGAGE CORPORATION, allege as follows:

## I.

## INTRODUCTION

1.      This is a class action for breach of the class action settlement agreement in an action captioned *In re: Wachovia Corp. "Pick-A-Payment" Mortgage Marketing and Sales Practices Litigation* (N.D. Cal. Case No. M:09-CV-2015-JF) (the "Wachovia Class Action"). Plaintiffs also bring claims for breach of the implied covenant of good faith and fair dealing, violation of California's Unfair Competition Law (Cal. Bus. and Prof. Code §§ 17200 *et seq.*) ("UCL"), and for relief under the All Writs Act (28 U.S.C. § 1651) and pursuant to the Court's equitable powers to enforce the class action settlement agreement that it finally approved. Plaintiffs bring this action against Defendants based on their willful failure to abide by the terms, and their frustration of one of the primary purposes, of the Agreement and Stipulation of

1

Settlement of Class Action in the Wachovia Class Action (the "Class Action Settlement Agreement"), which was finally approved by an Order of this Court (Fogel, J.) on May 17, 2011 (Dkt. No. 207) (the "Final Approval Order"). The Class Action Settlement Agreement became effective on September 7, 2011.

2. Defendant Wells Fargo's greed seems to have no bounds. As Defendant Wachovia Corporation was on the brink of collapse in the Fall of 2008 due in part to the troubled Pick-a-Payment loan portfolio it acquired from Defendant World Savings Bank, the Federal Deposit Insurance Corporation (FDIC) had secretly negotiated a sale of Wachovia Mortgage to Citigroup. That sale was announced on September 29, 2008, even though the parties had only signed a two-page term sheet. The next day, on September 30, 2008, at the direction of the Secretary of the Treasury, the Internal Revenue Service quietly issued IRS Notice 2008-83, effecting a change that Wells Fargo realized could provide it with a huge windfall. In a typical merger transaction, the acquiring company cannot use the acquired company's entire operating loss to offset its own profits, but instead, is limited to using $1 billion of those losses per year. The restriction exists to discourage companies from buying failing companies solely to avoid taxes and shelter their own profits. IRS Notice 2008-83 removed that restriction for transactions involving financial institutions, thereby permitting an acquiring bank to take advantage of the acquired bank's losses in full at any time.

3. The IRS's change prompted Wells Fargo to swoop in and seek to top Citibank's offer, which it did on October 3, 2008. The transaction allowed Wells Fargo to acquire Wachovia, which had assets of over $300 billion, for $15.1 billion. While Wachovia had substantial liabilities, and Wells Fargo knew that it would need to substantially write down Wachovia's Pick-a-Payment loan portfolio, the key to the deal for Wells Fargo was that it could use Wachovia's substantial losses to avoid paying taxes on its own profits, which could potentially save it $40 billion in taxes.

4.      Wells Fargo's strategy proved successful.  According to a 2011 report issued by Citizens for Tax Justice, Wells Fargo received $17.96 billion in tax breaks from 2008 through 2010, the most of any public company in that timeframe.  The result of this transaction meant that while it earned more than $49 billion during that time period, the bank paid no taxes; instead, it received a $681 million tax credit.  Thus, Wells Fargo saved more in taxes in three years than it paid to acquire Wachovia.  In other words, Wells Fargo effectively acquired Wachovia's assets for nothing.

5.      In the meantime, the Wachovia Class Action was proceeding, and hundreds of thousands of homeowners were suffering the effects of undisclosed negative amortization for their Pick-a-Payment loans, while the declining U.S. housing market was sucking the remaining equity out of their homes.

6.      Having acquired Wachovia's troubled mortgage loans, including its troubled Pick-a-Payment loan portfolio, prior to the settlement of the Wachovia Class Action, Wells Fargo agreed to try to assist homeowners with loan modifications using the government's Home Affordable Modification Program (HAMP) and its own proprietary Mortgage Assistance Program known as "MAP2."  As Wells Fargo had taken write-downs of over $35 billion for expected losses on the Pick-a-Payment loan portfolio, and it had effectively acquired those loans for virtually no cost, expectations were high that Wells Fargo would insure that a substantial number of homeowners would receive modifications to allow them to remain in their homes.  However, most homeowners were denied these loan modifications without any clear explanations from Wells Fargo, as it was using unverifiable subjective criteria to make its loan modification determinations.  Those homeowners who were offered loan modifications often ended up with higher monthly payments than they were making without the modifications.

3

With respect to negative amortization loans, such as Pick-a-Payment loans, Wells Fargo was not offering to reduce principal on the loans, but instead was merely offering to reduce the interest rate on the existing principal balances that had been inflated due to the guaranteed negative amortization, which had not been clearly and conspicuously disclosed in the Pick-a-Payment loan documents. These potential interest rate reductions were of little benefit to the class in the Wachovia Class Action, since the monthly payments on Pick-a-Payment loans were already based upon an interest rate lower than the rate that was actually charged on the loans – this feature of the loan had caused the substantial negative amortization. Thus, members of the class in the Wachovia Class Action had no avenue to reduce their monthly payments through loan modifications.

7. After over a year of mediation in the Wachovia Class Action, Class Counsel and Defendants reached an agreement to settle the case. The primary component of the Class Action Settlement Agreement was a new loan modification program known as "MAP2R." The MAP2R modification program was painstakingly designed by Class Counsel and Defendants to provide Settlement Class Members (defined below) in default at that time, and the tens of thousands of Settlement Class Members who were going to be in danger of defaulting in the next few years, with a modification program based upon objective, rather than subjective, criteria. MAP2R was much more beneficial for Settlement Class Members than HAMP, as MAP2R required Wells Fargo to provide principal forgiveness, eliminating virtually all of the accrued negative amortization, by reducing a borrower's principal balance to the market value of the home in circumstances where the loan's principal balance exceeded the home's market value. In the words of Defendants, MAP2R was designed to "provide Settlement Class Members with substantial non-monetary benefits." In connection with the settlement approval

CLASS ACTION COMPLAINT

process, Defendants stated under oath that the average value of a MAP2R loan modification was $147,163.00, including $40,000 in principal reduction.

8.      As with the prior loan modification programs, Defendants have not followed through on their promises to provide substantial relief to struggling homeowners.  As set forth below, Defendants have breached the Class Action Settlement Agreement, the implied covenant of good faith and fair dealing, and undermined the validity of the Court's Final Approval Order finding the Class Action Settlement Agreement to be a fair and adequate resolution of Settlement Class Members' claims in the Wachovia Class Action.  The numbers are striking. According to Wells Fargo's records, for the period from April 1, 2011 to September 30, 2012, there were 52,252 loan modification requests made by Settlement Class B members (borrowers who became in imminent threat of default after the parties agreed to the settlement).  Of those requests, Defendants have completed only 1,055 MAP2R modifications (approximately 2%).  In that same period, Settlement Class C members (borrowers who were in default at the time the parties agreed to the settlement) made 14,419 loan modification requests, but Defendants completed only 691 MAP2R modifications (less than 5%).

9.      Based on Defendants' improper conduct, the Class is entitled to preliminary and permanent injunctive relief enjoining Defendants' bad faith violations of the Class Action Settlement Agreement and the Court's Final Approval Order.  Additionally, Defendants' improper conduct has caused significant damages to Plaintiffs herein and numerous other Settlement Class Members whose loan modification applications have been denied.  In addition to the injunctive relief and damages for the contract claims, Plaintiffs also are entitled to appropriate restitution and injunctive relief for violations of the UCL, which applies to the entire Settlement Class pursuant to the Class Action Settlement Agreement's California choice

CLASS ACTION COMPLAINT

of law provision (§ XVII(B)), and to relief under the All Writs Act and pursuant to the Court's equitable powers to enforce the Class Action Settlement Agreement that it finally approved.

## II.

## THE DEFENDANTS

10.     Defendant Wells Fargo Home Mortgage is a division of Defendant Wells Fargo Bank, N.A., and has its principal place of business in South Dakota.  Defendant Wells Fargo Home Mortgage is a party to the Class Action Settlement Agreement, which, among other things, requires it to make loan modifications available between December 18, 2010, and June 30, 2013, for Settlement Class members, in accordance with the Loan Modification Program provisions of the Class Action Settlement Agreement.  As set forth herein.

11.     Defendant Wells Fargo Bank, N.A. is a national banking association licensed to do business and doing business in California, and has its principal place of business in South Dakota.  Wells Fargo Bank, N.A. is the primary United States operating subsidiary of Wells Fargo & Company, a Delaware corporation.  Defendant Wells Fargo Bank, N.A., is a party to the Class Action Settlement Agreement, which, among other things, requires it to make loan modifications available between December 18, 2010, and June 30, 2013, for Settlement Class members, in accordance with the Loan Modification Program provisions of the Class Action Settlement Agreement.

12.     Defendant World Savings, Inc. was a California corporation that originated some of the Pick-a-Payment mortgage loans that were the subject of the Wachovia Class Action. Defendant World Savings, Inc. is a party to the Class Action Settlement Agreement, which, among other things, requires it to make MAP2R loan modifications available between December 18, 2010, and June 30, 2013, for Settlement Class members, in accordance with the Loan Modification Program provisions of the Class Action Settlement Agreement.

CLASS ACTION COMPLAINT

Defendant World Savings Bank, FSB, was a federal savings bank that originated some of the Pick-a-Payment mortgage loans that were the subject of the Wachovia Class Action.  Defendant World Savings Bank, FSB, is a party to the Class Action Settlement Agreement, which, among other things, requires it to make loan modifications available between December 18, 2010, and June 30, 2013, for Settlement Class members, in accordance with the Loan Modification Program provisions of the Class Action Settlement Agreement.

13.     Defendant Wachovia Corporation ("Wachovia Corp.") was a North Carolina corporation.  Defendant Wachovia Corp. is a party to the Class Action Settlement Agreement, which, among other things, requires it to make loan modifications available between December 18, 2010, and June 30, 2013, for Settlement Class members, in accordance with the Loan Modification Program provisions of the Class Action Settlement Agreement.

14.     Defendant Wachovia Mortgage, FSB, now known as Wachovia Mortgage, a Division of Wells Fargo Bank, N.A., is a party to the Class Action Settlement Agreement, which, among other things, requires it to make loan modifications available between December 18, 2010, and June 30, 2013, for Settlement Class members, in accordance with the Loan Modification Program provisions of the Class Action Settlement Agreement.

15.     Defendant Golden West Financial Corporation ("Golden West") was a Delaware corporation.  Defendant Golden West is a party to the Class Action Settlement Agreement, which, among other things, requires it to make loan modifications available between December 18, 2010, and June 30, 2013, for Settlement Class members, in accordance with the Loan Modification Program provisions of the Class Action Settlement Agreement.

16.     Defendant Wachovia Bank, FSB ("Wachovia Bank") was a federal savings bank. Defendant Wachovia Corporation., a North Carolina corporation, is the parent corporation of Defendants Wachovia Bank and Wachovia Mortgage.  Defendant Wachovia Bank is a party to the Class Action Settlement Agreement, which, among other things, requires it to make loan

CLASS ACTION COMPLAINT

modifications available between December 18, 2010, and June 30, 2013, for Settlement Class members, in accordance with the Loan Modification Program provisions of the Class Action Settlement Agreement.

17.     Defendant Wachovia Mortgage Corporation ("Wachovia Mortgage") was a North Carolina corporation.  Defendant Wachovia Mortgage is a party to the Class Action Settlement Agreement, which, among other things, requires it to make loan modifications available between December 18, 2010, and June 30, 2013, for Settlement Class members, in accordance with the Loan Modification Program provisions of the Class Action Settlement Agreement.

18.     On October 1, 2006, Defendant Wachovia Corporation acquired Defendant Golden West Financial Corporation and all of its subsidiaries, including Defendants World Savings, Inc., and World Savings Bank, FSB.  On December 31, 2008, Wells Fargo & Company, a Delaware corporation, and the parent company of Defendant Wells Fargo Bank, N.A., acquired Defendant Wachovia Corporation and all of its subsidiaries, including Defendants Wachovia Bank, FSB, and Wachovia Mortgage Corporation.

### III.

### JURISDICTION AND VENUE

19.     The Court has subject matter jurisdiction over this action because the Class Action Settlement Agreement and the Court's Final Approval Order provide that the Court shall retain continuing and exclusive jurisdiction over, among others, Defendants and Settlement Class members, for the purpose of enforcing the terms of the Class Action Settlement Agreement.

CLASS ACTION COMPLAINT

20.     The Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2), the "Class Action Fairness Act," as the amount in controversy exceeds $5,000,000.00 and many Class Members are citizens of different states than those of which the primary Wells Fargo Defendants are citizens.

21.     Venue is proper in this District because Plaintiff and Defendants consented to this venue in the Class Action Settlement Agreement by virtue of the Agreement's provision that the Court retain continuing jurisdiction over them to enforce the terms of the Class Action Settlement Agreement.

## IV.

## FACTS RELEVANT TO ALL PLAINTIFFS' CLAIMS

### A.  The Settlement of the Wachovia Class Action

22.     On December 10, 2010, the plaintiffs in the Wachovia Class Action and Defendants executed the Class Action Settlement Agreement, which resolved all claims in the Wachovia Class Action.  This Court entered its Final Approval Order giving final approval to the Class Action Settlement Agreement on May 17, 2011.  Pursuant to Sections I.1.23 and I.1.28 of the Class Action Settlement Agreement, the settlement embodied in that Agreement became effective on September 7, 2011.

### B.  The Settlement Classes

23.     As part of the settlement, Section IV of the Class Action Settlement Agreement provided for the certification of the following settlement classes:

**Settlement Class A**

> All current and former Borrowers of World Savings Bank, FSB, now known as Wachovia Mortgage, FSB ("Wachovia Mortgage") who, (a) on or after August 1, 2003 and on or before December

9

31, 2008 entered into a loan transaction with Wachovia Mortgage that, as of the date of the loan's funding, was secured by their primary residence; (b) obtained financing from Wachovia Mortgage pursuant to a Pick-a-Payment mortgage loan promissory note; (c) have not previously released their claims pursuant to another settlement agreement, final judgment, or other dealings with Wachovia Mortgage; and (d) as of the Date of Preliminary Approval, no longer have a Pick-a-Payment mortgage loan because they sold the property securing the loan, refinanced the loan, paid off the loan personally, or have already obtained a loan modification that converted the loan from a Pick-a-Payment mortgage loan.

**Settlement Class B**

All current Borrowers of World Savings Bank, FSB, now known as Wachovia Mortgage, FSB ("Wachovia Mortgage") who, (a) on or after August 1, 2003 and on or before December 31, 2008 entered into a loan transaction with Wachovia Mortgage that is secured by their primary residence; (b) obtained financing from Wachovia Mortgage pursuant to a Pick-a-Payment mortgage loan promissory note; (c) have not previously released their claims pursuant to another settlement agreement, final judgment, or other dealings with Wachovia Mortgage; and (d) as of the Date of Preliminary Approval, still have a Pick-a-Payment mortgage loan and are not in Default.

**Settlement Class C**

All current Borrowers of World Savings Bank, FSB, now known as Wachovia Mortgage, FSB ("Wachovia Mortgage") who, (a) on or after August 1, 2003 and on or before December 31, 2008 entered into a loan transaction with Wachovia Mortgage that is secured by their primary residence; (b) obtained financing from Wachovia Mortgage pursuant to a Pick-a-Payment mortgage loan promissory note; (c) have not previously released their claims pursuant to another settlement agreement, final judgment, or other dealings with Wachovia Mortgage; and (d) as of the Date of Preliminary Approval, still have a Pick-a-Payment mortgage loan and are in Default.

24.     This Court certified the Settlement Classes in the Final Approval Order.

**C.   The MAP2R Loan Modification Program**

25.     The Class Action Settlement Agreement requires that Defendants make the expansive MAP2R loan modification program available to all members of Settlement Class C and members of Settlement Class B who are or become in "Imminent Default" by June 30, 2013.

26.     Section I.1.33 of the Class Action Settlement Agreement defines "Imminent Default" as "describ[ing] a Borrower (as defined in Section 1.7) who the Defendants have determined, in accordance with applicable HAMP guidance, as necessary, that default by the Borrower in making scheduled payments on his or her Pick-a-Payment mortgage loan is reasonably foreseeable.  In assessing whether a Borrower is facing Imminent Default, the Defendants will not consider funds held in a 401K, 457, 401(a), or 503 retirement account, an IRA, SEP IRA, Simple IRA, or Roth IRA.  Additionally, the fact that a Borrower is projected to Recast to a fully-amortizing payment under the terms of the Pick-a-Payment mortgage loan within the upcoming four (4) contractual Monthly Payments (as defined in Section 1.41 hereafter) using the current applicable interest rate as determined under the terms of the note, and the resulting increase, if any, to the respective Borrower's DTI (as defined in Section 1.22), shall be considered as a factor in the determination of Imminent Default."

27.     The test for "imminent default" was defined as having:

a.  Long Term Hardship, meaning a borrower that is having difficulty making his or her mortgage payments and the duration of that difficulty is expected to be greater than 12 months; and

b.  Financial Hardship, defined as one of the following that currently exists or occurs prior to June 30, 2013:

1.  Death of a borrower;

2.  Long-term or permanent disability or illness of a borrower or dependent family member;

3.  Legally-documented divorce or separation of the borrower and co-borrower;

4. Separation of borrowers unrelated by marriage, civil union, or similar civil domestic partnership under applicable law;

5. A combination of reduction of income and increase in housing expenses (principal and interest only) that exceeds 10% of current income. The comparison period shall be approximately 12 months prior to the date modification is sought; however, a greater period may be used if the condition has been consistent; and

c. Cash reserves of less than $25,000, excluding retirement accounts; and

d. The property is occupied by the borrower as his or her principal residence; and

e. The borrower's loan-to-value ratio must exceed 80%, or the loan must have a positive 'Net Present Value.'

28.     HAMP Directive 09-01, issued on April 6, 2009, clarifies that the imminent threat evaluation requires a mortgage servicer to fairly analyze a borrower's complete financial picture, as it states, "[t]he servicer must consider the borrower's financial condition, liquid assets, liabilities, combined monthly income from wages and all other identified sources of income, monthly obligations (including personal debts, revolving accounts, and installment loans), and a reasonable allowance for living expenses such as food, utilities, etc."

29.     Section VI(E) of the Class Action Settlement Agreement describes the MAP2R loan modification program:

**Loan Modification Program**.  Commencing on December 18, 2010 and continuing until June 30, 2013, the Defendants shall make loan modifications available for Settlement Class B Members in Imminent Default, who later become in Imminent Default, or who later become in Default, and Settlement Class C Members in

_____
CLASS ACTION COMPLAINT

accordance with the following provisions of this Section VI(E).  Such loan modifications shall be in addition to the amounts paid pursuant to the Common Fund, the Fee Award, and Administration Expenses described in Sections VI(A), (B), and (C) of this Agreement.

1. ***Loan Modifications To Be Considered***.  Subject to the provisions contained in Section VI(E)(4) and consistent with federal requirements, each Settlement Class B Member in Imminent Default, who later becomes in Imminent Default, or who later becomes in Default, and all Settlement Class C Members first shall be considered for a HAMP Modification.  Subject to the provisions contained in Section VI(E)(4), Settlement Class B Members in Imminent Default, who later become in Imminent Default, or who later become in Default, and Settlement Class C Members who do not qualify for or elect not to accept a HAMP Modification shall be considered for a MAP2R Modification on the terms as outlined in Sections VI(E)(2), (3), and (5) of this Agreement.

2. ***MAP2R Modification***.  Subject to the provisions contained in Section VI(E)(4), Settlement Class B Members in Imminent Default, who later become in Imminent Default, or who later become in Default, and Settlement Class C Members who do not qualify for or elect a HAMP Modification shall be considered for a MAP2R Modification on the terms as outlined in Sections VI(E)(3) and (5) of this Agreement.  The following process shall commence upon receipt of the documents described in Section VI(E)(7) and subsequent verification that the Settlement Class Member's DTI is above

_____

thirty-one percent (31%).  If a loan is modified under MAP2R, the loan will be converted to a fully-amortizing loan and the negative amortization feature will be eliminated.

3.  ***Waiver of Prepayment Penalties***.  The Defendants will waive all prepayment penalties and assess no fees in connection with a MAP2R Modification.   The Defendants shall not require a Borrower to make any up-front payment of arrears as part of the MAP2R Modification process.

4.  ***Borrowers With Prior Modifications***.  Settlement Class Members who have received earlier loan modifications not pursuant to this Agreement will not be eligible to be considered for new loan modifications under this Agreement.

5.  ***MAP2R Waterfall***.  The Defendants will apply the following waterfall, in the order listed below, until the Settlement Class Member's Monthly Payment reaches a DTI of thirty-one percent (31%).  The DTI may be slightly higher than thirty-one percent (31%) if the next step or action within the waterfall will result in a DTI below thirty-one percent (31%).  Once a DTI as close as possible to thirty-one percent (31%) is reached, the Defendants are not required to apply any additional steps in the waterfall, nor actions within a step.  If any step in the waterfall is already achieved, the Defendants will proceed to the subsequent step.  If all steps of the waterfall have been exhausted and a DTI of thirty-one percent (31%) cannot be achieved, the Defendants are not required to offer a MAP2R Modification.  Following application of the waterfall, all loans must pass the NPV test (as outlined in

Section 1.47 and Section VI(E)(6)) before a MAP2R Modification must be offered.  The MAP2R Modification waterfall is as follows:

a.  **Step 1**:  Waive all Accrued Interest, outstanding late charges, and outstanding fees.

b.  **Step 2**:  Escrow-related Advances and Corporate and Default-Related Advances first will be capitalized, then immediately and permanently forgiven.  If this forgiveness combined with the waiver of all Accrued Interest, outstanding late charges, and outstanding fees in Section VI(E)(5)(a) does not equal a number that represents ten percent (10%) of the unpaid principal balance (calculated by multiplying the pre-modification unpaid principal balance by ten percent (10%)), then Deferred Interest, if any exists, will be waived until the total of the waived Accrued Interest, Escrow-related Advances, outstanding late charges, outstanding Corporate and Default-Related Advances, and Deferred Interest results in a number that represents ten percent (10%) of the unpaid principal balance.  In the absence of Deferred Interest, only Accrued Interest, outstanding late charges, outstanding fees, Escrow-related Advances, and Corporate and Default-Related Advances will be forgiven.  While Accrued Interest, outstanding late charges, outstanding fees, Escrow-related Advances, and Corporate and Default-Related Advances will be waived for Settlement Class B Members in Imminent Default and all Settlement Class C Members, regardless of LTV, forgiveness of Deferred Interest will be applied only to the extent that it does not reduce the Settlement Class Member's current LTV below one hundred

CLASS ACTION COMPLAINT

percent (100%), even if the amount of such forgiveness represents less than ten percent (10%) of the unpaid principal balance.

c. ***Step 3***: Forgive principal until an LTV of one hundred fifty percent (150%) is achieved.

d. ***Step 4***: Extend the loan term and re-amortize the loan in one (1) month increments to a maximum term of four hundred eighty (480) months.

e. ***Step 5***: Forbear principal with the opportunity to be forgiven, as outlined in Section VI(E)(5)(h), until an LTV of one hundred twenty-five percent (125%) is achieved. The principal forbearance amount is non-interest bearing and non-amortizing. The amount of principal forbearance that is not forgiven will result in a balloon payment fully due and payable upon the earliest of the transfer of ownership of the property, payoff of the interest-bearing unpaid principal balance, or maturity of the loan. Should the Defendants choose to participate in HAMP Principal Reduction Alternative ("PRA"), Supplemental Directive 10-05, the LTV level of this step shall be adjusted from one hundred twenty-five percent (125%) to one hundred fifteen percent (115%) for modifications done on a prospective basis from the date the Defendants elect to participate in the PRA directive.

f. ***Step 6***: Reduce the interest rate in .125% increments. In all cases, the interest rate shall not be reduced below a floor of two percent (2%). If the interest rate after modification is below the Market Rate, this reduced rate will be in effect for the first three (3) years following the date of the loan modification. Thereafter, it will be increased by a maximum of one percent

(1%) per year at each twelve (12) month anniversary date of the original

modification until it reaches the Market Rate, at which time the rate shall be

fixed for the remaining loan term. If the interest rate after modification is

above or equal to the Market Rate, then that resulting rate shall become the

permanent rate for the remaining loan term. In no event will a step rate

increase result in a greater than fifteen percent (15%) increase in the portion

of the monthly payment for principal and interest. If it does, then the rate

shall only be increased by the amount that results in an interest rate such that

the increase in the monthly principal and interest portion of the payment is no

greater than fifteen percent (15%); thereafter, the rate will continue to

increase according to the terms above each year until the Market Rate is

ultimately reached.

g. **Step 7**: Forbear principal without the opportunity for conditional forgiveness

until an LTV of one hundred percent (100%) is reached.

h. **Step 8**: Conditional Forgiveness. Principal forborne under Section

VI(E)(5)(e) will be forgiven if the Settlement Class Member who received a

MAP2R Modification is in Good Standing on the first, second, and third

anniversaries of the loan modification. On each of the above anniversary

dates that such Settlement Class Member is in Good Standing, equal portions

of one-third (1/3) of the principal forbearance amount will be permanently

forgiven.

6. **NPV Test**. All potential MAP2R Modifications will be subjected to the NPV

Test described in Section 1.47 prior to being offered to a Settlement Class

Member.  The Defendants shall not be required to offer a MAP2R Modification to any Settlement Class Member whose NPV Test yields a negative NPV result.  However, the Defendants, may, in their sole discretion, offer a MAP2R Modification to a Settlement Class Member whose NPV Test yields a negative NPV result, or, if possible, the Defendants may offer an alternate modification.

7. ***Documentation Requirements***.  In determining the documents required of Settlement Class Members to apply for MAP2R Modifications, the Defendants, consistent with their need to obtain relevant financial information, will seek to minimize the burden on Settlement Class Members and maximize participation in the MAP2R Modification program.  The Defendants will not request signed affidavits from Settlement Class Members to document their hardship, and will not require more than one (1) year's income tax return, but will require documentary evidence of the Settlement Class Member's current income.

8. ***Servicing Commitments***.  In order to ensure that Borrowers are appropriately considered for a MAP2R Modification in a timely manner, the Defendants shall:

    a.  Maintain a dedicated, adequately staffed help line to handle inquiries from Settlement Class Members, including Spanish-speaking Settlement Class Members;

    b.  Assign a primary point of contact to each Settlement Class B Member and Settlement Class C Member seeking a loan modification;

c. Notify Settlement Class Members in writing within ten (10) business days of their submitting a modification request of any documents believed to be missing and necessary for evaluation for a MAP2R Modification;

d. Provide Settlement Class Members who do not qualify for HAMP or MAP2R Modifications, within thirty (30) calendar days of the Defendants' receipt of all required documentation from the Settlement Class Member, with a written explanation, which shall be copied to Lead Class Counsel, which clearly explains the reasons that the modification was denied;

e. Establish a formal second-look and escalation protocol for all Settlement Class B Members and Settlement Class C Members seeking a loan modification.

9. There is no obligation for the Defendants to offer MAP2R Modifications to Settlement Class Members who cannot be qualified under the HAMP or MAP2R guidelines.

10. ***Restrictions on the Foreclosure Process***.  The Defendants will apply HAMP rules under Supplemental Directive 10-02, dated March 24, 2010, and any applicable state laws regarding initiating or advancing foreclosures to Settlement Class Members being considered for HAMP or MAP2R Modifications.  In addition, the Defendants will ensure that each Settlement Class B Member and Settlement Class C Member being considered for HAMP or MAP2R Modifications:

CLASS ACTION COMPLAINT

a. Has notes in his or her electronic records accessible to all loan mitigation, modification, and foreclosure departments that indicate whether he or she is being considered for a loan modification; and

b. Receives in any foreclosure-related communication notice that he or she is still being considered for a modification, with the exception of notices generated by outside counsel or foreclosure trustee companies retained by the Defendants to assist with or conduct the foreclosure process.  The Defendants will develop and implement policies and procedures to provide notification to their foreclosure attorneys/trustees regarding a Settlement Class Member's modification status.

30.     This Court approved the MAP2R loan modification program and expressly noted its retention of jurisdiction over its implementation in the Final Approval Order.

**D.   Defendants' Failures to Comply with Their Obligations in the Class Action Settlement Agreement**

31.     Defendants agreed, in the Class Action Settlement Agreement, to implement the MAP2R program and to implement certain procedural safeguards to insure that all Settlement Class members who were entitled to MAP2R modifications would receive those modifications. Nevertheless, since signing the Class Action Settlement Agreement, Defendants have willfully failed to administer the MAP2R program in accordance with the terms of the Class Action Settlement Agreement and they have engaged in a concerted campaign to frustrate the efforts of Settlement Class members to obtain MAP2R loan modifications.

32.     Despite the extensive responsibilities that Defendants agreed to take on as part of the settlement, Wells Fargo failed to hire a sufficient number of employees to effectively implement the MAP2R loan modification program.  Further, it failed to properly train its employees to implement MAP2R, which has prevented Settlement Class Members from obtaining the loan modifications to which they are entitled as part of the settlement.

33.     Section VI(E)(7) of the Class Action Settlement Agreement states:  "In determining the documents required of Settlement Class Members to apply for MAP2R Modifications, the Defendants, consistent with their need to obtain relevant financial information, will seek to minimize the burden on Settlement Class Members and maximize participation in the MAP2R Modification program."  Defendants agreed in Section VI(E)(8)(c) to notify Settlement Class Members in writing within 10 days of any missing documents needed to evaluate the request.

34.     Despite their agreement to do so, Defendants failed to implement any meaningful procedures to minimize document requests.  Due to the lack of these procedures, and insufficient staffing and training, Wells Fargo has frequently asked Settlement Class Members for documents that were not necessary, lost many documents requiring Settlement Class Members to resend them multiple times, and placed undue time pressure on Settlement Class Members to provide unnecessary or previously submitted documents or face the termination of their modification requests.  Additionally, Settlement Class Members often receive incorrect or contradictory information concerning the documents that they need to provide as part of the loan modification application process.

35.     Wells Fargo has made the document submission process so difficult, that it has classified the majority of Settlement Class Members who have applied for loan modifications as

"Fall-Outs,"  a euphemism that Wells Fargo created to identify Settlement Class Members who cannot comply with its onerous document submission requirements and whose loan modification applications Wells Fargo does not even review.

36.     Wells Fargo has classified 37,079 of the 52,252 loan modification requests made by Settlement Class B Members as Fall-Outs.  Stated differently, Wells Fargo has made the loan modification process so arduous, that it has failed to even consider 71% of the loan modification applications of borrowers who believe that they are in imminent threat of defaulting on their mortgage loan.  Indeed, the process is so confusing and cumbersome that more than 25% (3,781 out of 14,419) of modification requests by Settlement Class C Members -- those borrowers who were *already* in default and at risk of foreclosure at the time of the settlement – have been classified as Fall-Out.

37.     Defendants agreed in Section VI(E)(8)(b) of the Class Action Settlement Agreement to "assign a single point of contact to each class member seeking a loan modification" to remedy the problem of borrowers not knowing with whom to communicate or to whom to send documents, which existed prior to the settlement.  Wells Fargo has failed to comply with this agreement, as it often switches Settlement Class Members' points of contact multiple times during the modification application process and on some occasions has assigned multiple "single points of contact" to a Settlement Class Member.  This has caused Settlement Class Members to receive incorrect and/or contradictory information concerning the loan modification application process, and Wells Fargo often fails to respond at all to Settlement Class Members inquiries.

38.     Defendants agreed in Section VI(E)(8)(d) of the Class Action Settlement Agreement to provide Settlement Class Members with written notice of a loan modification denial, and an explanation for that denial, within 30 days of a denial.  Wells Fargo has repeatedly failed to timely (if at all) notify Settlement Class Members of denials and often provides nothing more than a shorthand reason for the denial.  For example, many Settlement

1   Class Members have received denial letters that provide nothing more than "not in imminent

2   threat" as the basis for the denial.  In contrast to the procedure to which Defendants agreed in

3   the Class Action Settlement Agreement, the onus is then on the Settlement Class Member to call

4   and seek an explanation for the denial in order to determine if they have the ability to remedy

5   the purported deficiency in their application so that they can obtain a loan modification.

6          39.     Defendants agreed in Section VI(E)(8)(e) of the Class Action Settlement

7   Agreement to establish a "second-look and escalation protocol" for Settlement Class Members

8   whose applications for loan modifications were denied.  According to Wells Fargo's quarterly

9   reports, however, during an 18-month period in which Settlement Class Members submitted

10   66,762 loan modification requests, Wells Fargo initiated a Tier-2 review only 12 times.

11          40.     Defendants' failures to take the necessary steps to fulfill their obligations under

12   the Class Action Settlement Agreement have impacted the MAP2R loan modification process

13   from its very inception.  For example, the list of Settlement Class B Members that Defendants

14   provided to the claims administrator included borrowers who had already received loan

15   modifications under HAMP or MAP2.  According to Defendants, these borrowers were

16   supposed to be in Settlement Class A, and thus, not eligible for a MAP2R modification.

17   However, these borrowers have received notices indicating that they are Settlement Class B

18   Members, and thus, eligible to apply for MAP2R modifications if they are or become in

19   imminent default.  As a result, these Settlement Class Members have been spending time and

20   effort to apply for MAP2R modifications, yet even though they receive letters denying their

21   modification requests, they do not show up on any of the reporting provided to Class Counsel,

22   such that Class Counsel is unable to determine the reason for the denial.

23          41.     Well Fargo, in contravention of the HAMP eligibility guidelines incorporated in

24   the Class Action Settlement Agreement and the Agreement's provision that Defendants would

25   not charge any fee as a prerequisite to obtaining a loan modification, has required Settlement

26   Class Members with non-escrowed loans to make monthly payments to fund escrow accounts

27   (typically for taxes and homeowner's insurance) at the time they have applied for a loan

28

CLASS ACTION COMPLAINT

modification, rather than when a loan modification has been approved.  This has often led to Wells Fargo unnecessarily advancing tax and insurance payments that may or may not be in arrears, and requiring that borrowers' monthly payments include the amounts to be applied to the escrow account even though the borrower has not been (and may not ever be) approved for a loan modification, and had not previously needed to budget for these amounts.  Wells Fargo then applies these borrowers' payments first to outstanding interest and then to the monthly amount for the escrow account, which leaves fewer funds to apply to principal, and thus, causes further negative amortization.  Thus, Wells Fargo, aware that these borrowers were seeking assistance because they were sinking fast, decided to throw them an anchor instead of a life preserver.

42.     Section VI(E)(1) of the Settlement Agreement requires that all Settlement Class Members who are approved for HAMP modifications who "elect not to accept a HAMP Modification shall be considered for a MAP2R Modification."  Nevertheless, Wells Fargo fails to notify any Settlement Class Member who has been approved for a HAMP loan modification that he or she may still be evaluated for a MAP2R modification, which is typically much more beneficial to a borrower than a HAMP modification.  For most of the period since the Class Action Settlement agreement was approved by the court, HAMP modifications did not include the principal forgiveness that MAP2R provided.  As a result of Wells Fargo's failure to notify them of their eligibility for a MAP2R modification, 6,762 Settlement Class B members and 6,093 Settlement Class C members have had to accept a HAMP modification as the only modification that Wells Fargo has offered them, which was not the primary benefit in the Class Action Settlement Agreement, in exchange for which they released their claims against Defendants.

43.     Wells Fargo in contravention of the agreed-upon parameters for determination of imminent default, has required all Settlement Class B Members who meet all of the required conditions for imminent default, including an LTV of over 80%, to be subjected to the NPV calculation.

44.     To prevent harm to its balance sheet, Wells Fargo avoids, wherever possible, characterizing a loan as in imminent threat of default, as that characterization requires Wells Fargo to treat the loan as non-performing asset and take an appropriate reserve.  Thus, Well Fargo has intentionally failed to properly apply the "imminent default" criteria set forth above.

45.     The purpose of the MAP2R waterfall was to achieve an affordable monthly payment of Principal, Interest, Taxes, Insurance and Association dues (PITIA) for the borrower. The affordability threshold to which the parties agreed, which was based on the HAMP threshold, was 31% of a borrower's gross monthly income and other funds that were available to cover the monthly PITIA.  As set forth above, each step of the MAP2R waterfall was designed to reduce a borrower's payment to achieve the 31% figure.  Yet, for many borrowers who meet all the criteria for imminent threat of default, including a documented a long-term financial hardship and a monthly PITIA above the 31% threshold, Wells Fargo still denies modification requests because the borrowers are purportedly not in imminent threat of default.

46.     Wells Fargo's imminent threat of default methodology has been further cast into doubt by virtue of the fact that it has denied loan modification applications from Settlement Class C Members for "not being in imminent threat of default," even though borrowers are members of Settlement Class C because they were actually in default at the time of the settlement.  There is no requirement that a Settlement Class C Member remain in default, or demonstrate an imminent threat of default, in order to receive a MAP2R modification.

CLASS ACTION COMPLAINT

47.     Wells Fargo has used inflated property valuation numbers, derived from automated valuation models instead of independent appraisals, to improperly skew the MAP2R application process away from loan modifications.  Wells Fargo represented to Class Counsel prior to final approval of the Class Action Settlement Agreement that it would use independent appraisals for its MAP2R analysis, which caused Class Counsel to state the following at the Final Approval Hearing:  "for instance, a couple years ago defendants and other banks were using some kind of a computer program to determine the value of a property.  That's not the case here, they have to get an independent appraisal."  At that hearing, Defendants' counsel made a similar representation to the Court:  "we are using full appraisals from independent appraisers to obtain the value of the properties."

48.     These erroneous and inflated valuations have allowed Wells Fargo to improperly deny loan modifications based upon, among other reasons, negative NPV results (discussed in the next paragraph) and a borrower's supposed ability to make monthly payments using other assets.  Additionally, the MAP2R waterfall calculation has been skewed, as a higher property value lessens the amount of principal that can be forgiven under the waterfall.

49.     In addition to using inflated property values to skew the NPV calculation, Wells Fargo has manipulated this calculation in other ways that disfavor modification in favor of foreclosure.  The purpose of the NPV calculation is to determine the net present value of foreclosure and modification, so that Wells Fargo only commences a foreclosure if that would lead to a better economic result than a loan modification.  Yet, Wells Fargo's NPV calculation treats all steps of the MAP2R waterfall as costs of a loan modification, even though many Settlement Class Members will reach the 31% PITIA threshold without the need for Wells Fargo to apply the entire waterfall.  Further, Wells Fargo's NPV calculations often use inflated

income amounts, deflated PITIA amounts, and subjective factors that were never disclosed to Class Counsel when Defendants explained the NPV calculation (the NPV calculation methodology was not in the Class Action Settlement Agreement, as Defendants claimed it was proprietary; the Class Action Settlement Agreement required Defendants to explain it to Class Counsel. The foregoing actions have caused Wells Fargo's NPV calculations to improperly tilt in favor of foreclosure.

50.     Wells Fargo also consistently inputs the wrong criteria into its calculations by listing the wrong loan type (fixed, instead of variable) and the wrong current interest rate, once again skewing the results to make it appear that foreclosure is the more financially beneficial approach.

51.     Wells Fargo has incentive to force borrowers into foreclosure because that enables it to receive financial benefits, such as insurance proceeds that cover the difference between the amount owed on the loan and the amount for which Wells Fargo is able to sell the property after foreclosure. Also, loan modifications require resources, such as personnel and training time, that Wells Fargo apparently would prefer not to expend, despite the commitments it made in the Class Action Settlement Agreement and to the Court during the settlement approval process.

52.     All of the foregoing improper actions by Defendants have deprived Settlement Class Members of the negotiated benefits in the Class Action Settlement Agreement. Wells Fargo has improperly denied, or failed to even evaluate, tens of thousands of Settlement Class Members' loan modification applications. These Settlement Class Members often are forced to make a Hobson's choice -- either default on their mortgage and lose their home, or sink deeper into debt (or use hard-earned retirement savings) to try and stave off homelessness.

_____
CLASS ACTION COMPLAINT

53.     Wells Fargo is not a weakened financial institution that cannot help homeowners because it is struggling to rebound from the credit crisis of a few years ago, but instead, is a thriving company that recently announced record profits of nearly $5 billion in the third quarter of 2012.  Thus, Wells Fargo's continued efforts to prevent borrowers from receiving loan modifications are particularly appalling, as the bank is clearly motivated by greed.  Indeed, if Wells Fargo had provided a loan modification to every eligible Settlement Class Member who requested one to date, it still would have earned over $15 billion in just the last year and a half.

## V.

## FACTS SPECIFIC TO NAMED PLAINTIFFS

**Richard D'Alessio**

54.     Plaintiff Richard D'Alessio, a resident of California and a member of Settlement Class C, applied for a loan modification in January 2011.  Three days after confirming receipt of Mr. D'Alessio's application, Wells Fargo denied the modification request under HAMP because it could not achieve an affordable monthly payment for Mr. D'Alessio after applying all steps of the HAMP waterfall.  Wells Fargo also denied the modification request under MAP2R due to a negative NPV result.

55.     In late January 2011, Mr. D'Alessio received a letter from Wells Fargo that invited him to apply for a loan modification, which he did in February 2011.  On March 29, 2011, Wells Fargo denied Mr. D'Alessio's loan modification application under MAP2R again due to a negative NPV result.  In reviewing his loan modification denial letter, Mr. D'Alessio determined that Wells Fargo had valued his property at $870,000, which was a significantly inflated value.  Wells Fargo did not use an independent appraisal to derive this value, even though it represented to Plaintiffs and the Court that it would only use independent appraisals.

56.     On May 4, 2011, Mr. D'Alessio received a letter from Wells Fargo stating that his documents were being reviewed.

57.     On May 11, 2011, Mr. D'Alessio received a letter from Wells Fargo stating that it required additional documentation from Mr. D'Alessio.

58.     Mr. D'Alessio complied with the requests in Wells Fargo's May 11, 2011 letter and all other requests from Wells Fargo.  In total, Mr. D'Alessio furnished documents to Wells Fargo on nine separate occasions and his submissions totaled hundreds of pages.

59.     On August 28, 2011, Mr. D'Alessio received another denial letter due to another negative NPV result.   This letter reflected that Wells Fargo had used a value of $560,000 for his property, which, again, was inflated and not the result of an independent appraisal. Moreover, this value, while still inflated, was over 35% less than the value on which Wells Fargo had relied to deny Mr. D'Alessio's modification request only four months earlier.

60.     Thereafter, Mr. D'Alessio ran his own NPV test using the United States Treasury Department website, www.checkmynpv.com, and an accurate value for his home.  In reviewing the results, Mr. D'Alessio concluded that Wells Fargo failed to use the proper market value, credit score and income for the NPV calculation, which had negatively impacted the NPV result.  Wells Fargo never changed its valuation of Mr. D'Alessio's home or the other incorrect inputs for the NPV test and ultimately commenced a foreclosure.

61.     According to Wells Fargo, the NPV calculation for Mr. D'Alessio used an unpaid principal balance of $513,274.81. This figure was incorrect, as it did not include accrued and unpaid interest of over $50,000; consequently, the correct unpaid principal balance was approximately $565,000. This figure is confirmed by the Notice of Trustee Sale for Mr. D'Alessio's home, which contained an outstanding balance of $613,217.30, which was likely

comprised of the correct principal balance of approximately $565,000 and the approximately $50,000 in costs that Wells Fargo had incurred in completing the foreclosure.

62.     In addition to using inflated market values for Mr. D'Alessio's home that fluctuated wildly, were not based on independent appraisals, and were unrelated to any realistic amount that Wells Fargo could expect to recover from a foreclosure sale, Wells Fargo's NPV calculation also indicated that the value of not performing a modification was $491,230, which was clearly incorrect.

63.     Wells Fargo sold Mr. D'Alessio's home on November 29, 2011, for $478,000, which was approximately 15% below the value used by Wells Fargo in the NPV test only three months prior and over 45% below the value used by Wells Fargo in the NPV test only seven months earlier.

64.     At the time of the denial, Mr. D'Alessio owed approximately $565,000, yet Wells Fargo chose to sell the property at foreclosure, which cost approximately $50,000 to pursue, for substantially less than the amount owed by Mr. D'Alessio.  Thus, rather than provide Mr. D'Alessio with a loan modification, Wells Fargo ultimately netted approximately $410,000 on a property that its own records claimed was worth substantially more than that amount.

65.     Wells Fargo does not provide its calculation of the Net Present Value of completing a loan modification, but that figure can easily be computed using the data that Wells Fargo does provide and a financial calculator.  For Mr. D'Alessio, this calculation yields $528,748.92 as the Net Present Value of giving him the modification.

66.     Mr. D'Alessio, should have had an NPV positive result and received a MAP2R modification, but he was denied for a loan modification because of Wells Fargo's utter failure to

fulfill its obligations under the terms of the Class Action Settlement Agreement. Wells Fargo's actions breached the Class Action Settlement Agreement and reflect that Wells Fargo acted intentionally to prevent Mr. D'Alessio from receiving the loan modification to which he is entitled under the Class Action Settlement Agreement. As a result of Wells Fargo's conduct, Mr. D'Alessio has suffered substantial damages.

**John and Diana Burkett**

67. Plaintiffs John and Diana Burkett are residents of Florida and are members of Settlement Class C. They have been married for 32 years and currently have three of their six children living with them in their home. Mr. Burkett and his father-in law built the Burketts' home together 18 years ago, so it has very special significance to them. One of their children, five-year old Adrianna, suffers from autism, which caused Mrs. Burkett to have to reduce her employment hours to be home more often for her daughter. Adrianna has difficulty adjusting to change, and that triggers most of her episodes. The Burketts' biggest fear is that if they lose their home, it will set Adrianna back to where she was three years ago, as it took her a long time to finally get accustomed to her current home.

68. On multiple occasions over the last year, the Burketts have attempted to secure a loan modification from Wells Fargo. Their Hardship Affidavit indicated reduction of income as the main reason for their hardship, but they also included a written hardship letter as well indicating illnesses and the health of their daughter as additional reasons for the hardship.

69. The Burketts' Income and Expense sheet showed combined income of $5,200 per month and their PITIA payment was approximately $2,090 per month. An affordable payment of 31% of their monthly income would result in a monthly PITIA payment of $1,612, but Wells Fargo denied their loan modification application each time by indicating that the

Burketts were already below the 31% PITIA threshold.  Wells Fargo's clear error concerning the PITIA percentage is evidenced by the Burketts' NPV form.  That form reflects that Wells Fargo used an improperly inflated monthly income amount for the Burketts, which is not based on the documents that the Burketts sent to Wells Fargo.  Thus, the loan modification denial was improper.

70.     Wells Fargo's actions breached the Class Action Settlement Agreement and reflect that Wells Fargo acted intentionally to prevent the Burketts from receiving the loan modification to which they are entitled under the Class Action Settlement Agreement.  As a result of Wells Fargo's conduct, the Burketts have suffered substantial damages.  Further, Wells Fargo has set a foreclosure sale date of the Burketts' home for January 9, 2013, such that they will likely suffer additional damages as a result of Wells Fargo's improper conduct.

**Chan C. Pharn**

71.     Plaintiff Chan C. Pharn is a resident of California and member of Settlement Class B.  He immigrated to the United States as a young boy.  After years of pursuing his dream of being and American citizen, he became one.  He lost his wife in 1994, at which time he became the sole provider for his two young children.  He has lived in his home for 11 years and now relies on Social Security and welfare as his sole means of support due to his deteriorating health.

72.     Mr. Pharn applied for a loan modification by faxing his application and a Hardship Affidavit to his Home Preservation Specialist, Joe Elizondo, on November 29, 2011. The Hardship Affidavit reflected that his income had been reduced such that he was receiving a Social Security payment of $1,210 per month and a welfare payment of $550 per month.  His expenses were listed at approximately $1,900 a month.

73.     Wells Fargo denied Mr. Pharn's modification application on December 9, 2011, because he allegedly was not in imminent default under HAMP as he had the ability to pay his mortgage using cash reserves or other assets.  The letter did not mention the MAP2R loan modification program, even though Mr. Pharn's application and supporting papers had demonstrated a financial hardship in accordance with the Class Action Settlement Agreement and he met all of the other requirements for imminent default pursuant to the Class Action Settlement Agreement.  On December 19, 2011, Mr. Pharn sent a letter to Wells Fargo disputing his denial.  By letter dated January 20, 2012, Wells Fargo responded that "[w]e determined you have the ability to pay your current mortgage payment using cash reserves and/or other assets.  Your loan to value (LTV) ratio of 78.36% is below 80%, therefore, other assets are available."  Wells Fargo's position was that it believed he could sell his home in order to be able to make the payments on that home.

74.     At that time, Mr. Pharn believed that his home was worth $100,000 which was less than the principal balance on his loan of approximately $109,000.  On June 7, 2012, Mr. Pharn's suspicions were confirmed when he called Wells Fargo for additional information regarding the denial.  Wells Fargo responded that Mr. Pharn had no equity in his home, even though less than 5 months earlier it had purportedly determined that he had an LTV of 78.36%.

75.     Wells Fargo did not use an independent appraisal to determine the fair market value of Mr. Pharn's home.  Had it done so, it would have found that his LTV was 109%, requiring principal forgiveness of $9,000 and a new principal balance of $100,000 as part of the modification.  These changes would have allowed Mr. Pharn to have his PITIA payments reduced to 31% of his income.  Instead, Wells Fargo took the ridiculous position that Mr. Pharn

_____

was not eligible for a loan modification because he had equity of 1.64% above the threshold amount, and thus, was not in imminent threat of default.

76.     Wells Fargo's improper denial of Mr. Pharn's loan modification application has caused tremendous stress on Mr. Pharn and his family.  Each month, they have had to borrow money from family and friends in order for Mr. Pharn to make his mortgage payment.  He and his wife have increased their credit card debt so high that they have little or no available credit.  Mr. Pharn has not purchased clothing for his children in over two years, has eliminated eating out, and has reduced his utility bills by going without every day comforts.  Oftentimes, he does not have enough money to buy gas in order to transport his children to school.

77.     Wells Fargo's actions breached the Class Action Settlement Agreement and reflect that Wells Fargo acted intentionally to deny Mr. Pharn a loan modification to which he is entitled under the Class Action Settlement Agreement.  Due to Wells Fargo's conduct, Mr. Pharn has suffered substantial damages.

**Christina Zako**

78.     Plaintiff Christina Zako is a resident of California and member of Settlement Class B.  When she bought her home in Hollister approximately 7 years ago, she was a single mother of two young daughters.  In 2011, her oldest daughter developed a blood clot in her brain which required extensive care and hospitalization.

79.     On March 9, 2011, Ms. Zako sought mortgage loan assistance from Wells Fargo by faxing her complete loan modification and a Hardship Affidavit to Wells Fargo.  The Hardship Affidavit indicated that she had experienced reduced income and excessive monthly debt.  Ms. Zako also sent Wells Fargo a document explaining that her lowered income was due to the facts that her work hours had been reduced and her husband's salary had been frozen for

two years.  Her Income and Expense sheet listed combined income for her and her husband of $9,370.  At the time of the application her PITIA payment was approximately $3,368 per month.

80.     On March 11, 2011, Ms. Zako received a letter indicating that she needed to send Wells Fargo the same documents that she had sent on March 9, 2011.  Thus, on March 11, 2011, Ms. Zako re-faxed those documents.

81.     On March 23, 2011, Wells Fargo informed Ms. Zako by telephone that she did not meet the necessary criteria to receive a modification, but did not offer any further explanation.  Ms. Zako never received a letter of explanation regarding her denial.  On June 15, 2012, Ms. Zako called Wells Fargo and spoke with Linda Andrews of the Home Mortgage Department.  Ms. Zako requested a copy of her denial letter and was informed she would receive it within seven days.  Ms. Zako has yet to receive the denial letter.

82.     Wells Fargo's records reflect that Ms. Zako's modification application was denied because she was not in imminent threat of default, even though she had met all the requirements to be in imminent threat of default.  At the time Ms. Zako submitted her loan modification application, her principal balance was over $430,000, while her property was worth less than $300,000.

83.     Had Wells Fargo used a reasonable process that complied with the Class Action Settlement Agreement to determine whether she was in imminent default, she would have met that criteria and qualified for a loan modification.

84.     Wells Fargo's wrongful denial has caused Ms. Zako to not only work her normal shift of 8:00 A.M. to 5:00 P.M., but she takes the 10:00 P.M. to 7:00 A.M. shift whenever possible in order to pay her mortgage.  This has caused her tremendous suffering, as she is

unable to be there for her children, and she is exhausted much of the time.  She has had to cash out her life insurance policy which she had for over 20 years to protect her children, in order to pay down the credit card debt she incurred to make sure that she could meet her unmodified monthly mortgage obligations.

85.     Wells Fargo's actions breached the Class Action Settlement Agreement and reflect that Wells Fargo acted intentionally to prevent Ms. Zako from receiving the loan modification to which she is entitled under the Class Action Settlement Agreement.  Due to Wells Fargo's conduct, Ms. Zako has suffered substantial damages.

**Paul and Julie McDermed**

86.     Plaintiffs Paul and Julie McDermed are residents of Illinois and members of Settlement Class B.  They have lived in their house for ten years and raised their two children there.

87.     The McDermeds sought mortgage assistance from Wells Fargo on May 8, 2011 by faxing their application, supporting documents and a Hardship Affidavit.  The Hardship Affidavit indicated that their household expenses and mortgage payment had increased.  The Income and Expense sheet showed income of $7,346 and monthly expenses of $4,072.  At the time of the application the McDermeds' principal balance was approximately $607,000, while the market value of the property was only $502,000.

88.     On May 17, 2011, Wells Fargo sent the McDermeds a letter indicating their file was under review.  On May 20, 2011, they received an additional letter asking for condominium association documents and financial information, which they furnished to Wells Fargo.

89.     By letter dated June 3, 2011, Wells Fargo denied the McDermeds' application under HAMP due to the inability to create a payment equal to 31% of the McDermeds' gross

_____

income after applying all steps of the waterfall.  The letter did not mention the MAP2R loan modification program.

90.     The McDermeds have never received a letter indicating that their application was evaluated for a MAP2R modification and they are not listed on any of the reports that Wells Fargo has provided to Class Counsel.  The McDermeds were provided with the Class action Notice for Settlement Class B as well as the Notice for Settlement Class A, and believed that as part of the settlement they would be entitled to seek a loan modification.

91.     Had the McDermeds been properly evaluated for a loan modification, they would have been able to have had their PITIA payment reduced to 31% of their monthly income, and they would have secured a loan modification.

92.     Wells Fargo's actions breached the Class Action Settlement Agreement and reflect that Wells Fargo acted intentionally to prevent the McDermeds from receiving the loan modification to which they are entitled under the Class Action Settlement Agreement.  As a result of Wells Fargo's conduct, the McDermeds have suffered substantial damages.

**Thomas and Linda Geremia**

93.     Plaintiffs Thomas and Linda Geremia are residents of California and members of Settlement Class B.  They are each 54 years old and they have each been employed by the United States Postal Service for over 25 years.  They have lived in their home for over 22 years and raised their two daughters there.

94.     After speaking with a Wells Fargo representative concerning mortgage assistance on March 7, 2011, the Geremias applied for a loan modification on March 8, 2011 by faxing their application, supporting documents, and a Hardship Affidavit to Wells Fargo.  The Hardship Affidavit stated that their household expenses had increased, their debt payments had

become excessive, and that they did not have sufficient liquid assets to cover living expenses. The Income and Expense sheet indicated that the Geremias had monthly income of $8,100 and monthly expenses of $5,064. As part of the monthly expenses, they listed a mortgage payment of $2,330, property taxes of $284 per month, and property insurance of $350 per month. At the time of the application, the Geremias' principal balance was approximately $380,000, while their home had a market value of approximately $335,000.

95. On March 10, 2011, the Geremias received confirmation that their loan modification application was complete and under review. That same day, Wells Fargo informed the Geremias that it had established an escrow account for the payment of property taxes and insurance.

96. On March 14, 2011, Mr. Geremia sent a letter to Wells Fargo stating that they did not want Wells Fargo to proceed with the escrow account, as their property taxes and insurance were current. The letter included proof of payments and that the accounts were current.

97. On March 15, 2011, Wells Fargo sent a letter to the Geremias stating that it would take 10 days to cancel the escrow account.

98. On March 17, 2011, the Geremias sent another letter to Wells Fargo, with the proof that the taxes and insurance had been paid and the accounts were current, asking Wells Fargo to cancel the escrow account immediately.

99. On March 18, 2011, Wells Fargo informed the Geremias that the escrow account could not be terminated until the Geremias paid Wells Fargo $642.95 for a supposed deficiency in the account.

CLASS ACTION COMPLAINT

100.     By letter dated March 18, 2011, Wells Fargo denied the Geremias' application for a modification under HAMP for failure to document a hardship.  The Geremias were also denied under MAP2R for not meeting the imminent default criteria.  However, the Geremias' application and supporting papers had demonstrated a financial hardship in accordance with the Class Action Settlement Agreement and they met all of the other requirements for imminent default pursuant to the Class Action Settlement Agreement.

101.     As a result of Wells Fargo's wrongful denial, the Geremias have had to resort to using the credit available on their credit cards in order to stay current on their mortgage.  They have debated selling their camping trailer in order to raise some cash, but fear doing so because if they are foreclosed upon they plan to live in the trailer.  The fear of losing their home has cause significant emotional distress to both of them.

102.     Wells Fargo's actions breached the Class Action Settlement Agreement and reflect that Wells Fargo acted intentionally to prevent the Geremias from receiving the loan modification to which they are entitled under the Class Action Settlement Agreement.  As a result of Wells Fargo's conduct, the Geremias have suffered substantial damages.

103.     Wells Fargo also violated the Class Action Settlement Agreement, its incorporation of HAMP's requirements, and the implied covenant of good faith and fair dealing in the Class Action Settlement Agreement by establishing a mandatory escrow account for the Geremias' loan, requiring the Geremias to make monthly escrow account payments, and demanding payment for a deficiency in the escrow account, even though the Geremias were never approved for a loan modification.

**Julie A. and David W. Young**

104.    Plaintiffs Julie A. and David W. Young are residents of California and members of Settlement Class B.  The Youngs have been married for 22 years and have two children.

105.    On January 20, 2012, the Youngs sent Wells Fargo a completed loan modification application including the Hardship Affidavit, pay stubs, and tax return.  The Hardship Affidavit reflected that they had increased expenses, reduced income and excessive debt.  The Income and Expense sheet showed gross monthly income of $8,885 and monthly expenses of $6,537.66.  The monthly expense portion listed a mortgage payment of $2,286.04, plus payments for homeowners' insurance of $145.67 and property taxes of $430.95.  At the time of their application, the Youngs' principal balance was approximately $517,000, while they believed that the value of their home was only $345,000.

106.    On January 26, 2012, Wells Fargo sent a letter to the Youngs requiring them to resend the Hardship Affidavit, Dodd Frank Certification, and two recent pay stubs, which the Youngs did on January 27, 2012.

107.    On February 1, 2012, Wells Fargo indicated that the Youngs had sent all of the necessary documents, such that their application was "under review."  On that same day, Wells Fargo sent the Youngs a letter indicating that because the Youngs had applied for a loan modification, Wells Fargo was establishing an escrow account for property taxes and insurance that would be required for the remaining life of the loan.

108.    On February 13, 2012, 12 days after the Youngs' application was supposedly complete and under review, Wells Fargo sent the Youngs another letter indicating that they were required to once again submit two paystubs, and that Wells Fargo now needed them to provide a quarterly or year to date profit and loss statement, and a "letter of explanation."  As Wells Fargo's letter did not provide any guidance for the content of the letter of explanation, the

Youngs contacted Wells Fargo for clarification.  After the Youngs clarified what they were being required to explain, they complied on February 15, 2012 by sending a letter with details concerning their IRA rollover and providing additional pay stubs.  Further, even though Mr. Young was an employee who received a W-2, they created a profit and loss statement in accordance with Wells Fargo's request.

109.    On March 5, 2012, Wells Fargo denied the Youngs' loan modification application under HAMP and MAP2R for not documenting a financial hardship.  The Youngs immediately contacted Wells Fargo to request review of their denial.  On April 12, 2012, the Youngs received a letter indicating that according to Wells Fargo's calculations, the Youngs were at an PITIA of 33.58% and therefore not eligible for a modification.  Wells Fargo derived this percentage by using a monthly income figure that was greater than the monthly income amount on the Youngs' Hardship Affidavit and tax return, and a monthly housing expense amount that was not based upon the Youngs' fully amortizing principal and interest payment, property taxes, insurance and homeowners' association dues as required.  The letter did not provide any explanation as to why Wells Fargo did not use the correct figures.  Similarly, the letter did not explain why the Youngs were not eligible for a loan modification, even though their PITIA was above the 31% threshold using Wells Fargo's incorrect figures.

110.    To continue to survive and remain in their home, the Youngs have resorted to using credit cards to pay bills and have now used all of their available credit, which has resulted in unmanageable debt and ever increasing credit card balances due to exorbitant interest charges.  They have fallen behind on their mortgage, do not have sufficient funds to pay the current monthly payment, and fear a foreclosure.

CLASS ACTION COMPLAINT

111.    Wells Fargo's actions breached the Class Action Settlement Agreement and reflect that Wells Fargo acted intentionally to prevent the Youngs from receiving the loan modification to which they are entitled under the Class Action Settlement Agreement.  As a result of Wells Fargo's conduct, the Youngs have suffered substantial damages.

112.    Wells Fargo also violated the Class Action Settlement Agreement, its incorporation of HAMP's requirements, and/or the implied covenant of good faith and fair dealing in the Class Action Settlement Agreement by establishing a mandatory escrow account for the Youngs' loan and requiring the Youngs to make monthly escrow account payments, even though the Youngs were never approved for a loan modification.

**Michael and Kathy Lerner**

113.    Plaintiffs Michael and Kathy Lerner are residents of California and members of Settlement Class B.  Mr. Lerner, who is in his late sixties, and Mrs. Lerner, who is in her early seventies, have been married for 42 years, and have three children.  One of their children suffers from a mental illness that has required a lot of attention and financial resources.  They have lived in their home for approximately five years.  Mrs. Lerner suffers from significant medical issues resulting from nuclear meltdowns at the Santa Susana Field Laboratory, to which she previously lived in close proximity.  Her medical condition continues to worsen with age and has impacted her ability to earn a living as an oil painter.

114.    On August 10, 2012, Michael Lerner contacted Wells Fargo to inquire about potential mortgage relief, as the Lerners were finding it increasingly difficult to keep up with their monthly expenses.  Wells Fargo did an intake of their information over the phone and requested supporting documents.  On August 15, 2012, Mr. Lerner faxed the required documents to Wells Fargo, including a loan modification Application and Hardship Affidavit. The Hardship Affidavit indicated that the Lerners had little remaining liquid assets with which

_____

to pay their mortgage and basic living expenses.  The Lerners also included a personal letter describing the Lerners' history of real estate losses, their medical conditions, and that their business income had been reduced to virtually nothing.  The Lerners' Income and Expense sheet reflected monthly income of $8,400 (social security income of $1,500 and self-employment income of $6,900) and monthly expenses of over $10,900.

115.    On August 18 and 23, 2012, Wells Fargo requested some additional information and asked the Lerners to resend their loan modification application.  The Lerners complied with these requests promptly.  On August 24, 2012, Wells Fargo requested proof that the Lerners were residing in the home, which the Lerners provided promptly by fax.  On August 30, 2012, Wells Fargo contacted the Lerners to request explanations regarding the Lerners' previously submitted tax return and profit and loss statement.  Additionally, Wells Fargo requested that the Lerners resubmit their modification application with a new date and signature.  Once again the Lerners complied promptly.  On August 31, 2012, a Wells Fargo representative confirmed receipt of all necessary documents.  On or about September 4, 2012, Wells Fargo again requested that the Lerners resubmit their loan modification application with a current date and signature.  On September 11, 2012, Wells Fargo requested that the Lerners modify their Income and Expense declaration to move rental income to self-employment income and to re-sign and date the application again.

116.    On September 20, 2012, the Lerners were denied a HAMP loan modification because their proposed modified payment amount would exceed 42% of their income.  On September 21, 2012, they were denied a MAP2R modification because they have "excessive financial obligations." Excessive financial obligations are not a basis to deny a MAP2R loan modification under the Class Action Settlement Agreement.

117. As part of the denial, Wells Fargo sent the Lerners an NPV worksheet that listed incorrect information regarding their income and the value of their home. The NPV worksheet listed income of $6,928.43 which is lower than the Lerners' actual monthly income. It also showed that the current amount owed on the mortgage was over $750,000 and a current market value of $681,400 for the Lerners' home, which was well above the true current market value of the property. To determine the current market value of the Lerners' home, Wells Fargo did not obtain an independent appraisal, but instead, used an automated value system.

118. Additionally, the NPV data provided by Wells Fargo to the Lerners was not useful, as it failed to even include any numbers reflecting the terms of a proposed modification.

119. As the Lerners remain in default on their mortgage due to Wells Fargo's improper denial of their modification application, Wells Fargo is likely going to issue a Notice of Default shortly to initiate a foreclosure. Living each day knowing they will potentially be homeless has caused and continues to cause the Lerners severe emotional distress.

120. Wells Fargo's actions breached the Class Action Settlement Agreement and reflect that Wells Fargo acted intentionally to prevent the Lerners from receiving the loan modification to which they are entitled under the Class Action Settlement Agreement. As a result of Wells Fargo's conduct, the Lerners have suffered substantial damages.

**Omar F. and Ruth M. Bishr**

121. Omar F. and Ruth M. Bishr are residents of Florida and members of Settlement Class B. Mr. Bishr is a 51-year old retired fire fighter and Mrs. Bishr is a nurse practitioner at the Veterans Administration. They have lived in their family home since July 2003. They have three children who have lived in that home for the majority of their lives. Omar has a one-man carpentry business that he operates to supplement his retirement benefit. He also suffers from a medical condition that requires a treatment plan that he cannot follow because it would cause

44

him to be unable to work for extended periods of time, which he cannot do because the lost income would prevent the Bishrs from meeting their monthly payment obligations.

122.   The Bishrs applied for mortgage assistance from Wells Fargo on June 27, 2011 by completing the HAMP application.  They indicated that they were seeking a loan modification because they were suffering a financial hardship due to reduced income and increased expenses.

123.   The income section of the application stated a monthly income of $9,355 from a combination of current salary and retirement benefits.  The application listed current housing expense at over $3,700 per month.  Since the target PITIA of 31% would have required monthly housing expenses of approximately $2,900, the Bishrs were in imminent threat of default.

124.   On June 30, 2011, the Bishrs received a letter from Wells Fargo stating that they needed to provide a schedule of owned real estate and signed tax returns.  On July 7, 2011, the Bishrs faxed all of the requested documents to Wells Fargo.  Thereafter, the Bishrs were informed by telephone that their application had been denied.  They never received a denial letter from Wells Fargo explaining the reasons for the denial.  A Wells Fargo report provided to Class Counsel indicates that the Bishrs' application was denied because they were not in imminent threat of default, even though they met all of the criteria to be in imminent threat of default.

125.   As a result of Wells Fargo's improper denial of their modification application, the Bishrs have been forced to drain their retirement accounts in order to remain in their home and stay current on their bills, such that they no longer have any retirement savings.  Additionally, they are being hounded by collection calls due to bills that have gone unpaid in order to maintain their mortgage.

CLASS ACTION COMPLAINT

126.    Wells Fargo's actions breached the Class Action Settlement Agreement and reflect that Wells Fargo acted intentionally to prevent the Bishrs from receiving the loan modification to which they are entitled under the Class Action Settlement Agreement.  As a result of Wells Fargo's conduct, the Bishrs have suffered substantial damages.

**Jeff Cory**

127.    Jeff Cory is a resident of California and a member of Settlement Class B.  He has four children.

128.    In late January 2011, Mr. Cory contacted Wells Fargo by telephone for mortgage assistance.  On January 31, 2011, a Wells Fargo representative informed Mr. Cory that she was assigned to his file and she requested that Mr. Cory send documentation in support of his telephone request.  The following day, a different Wells Fargo representative indicated that she was assigned to his file and requested the same documentation.

129.    On February 3, 2011, Mr. Cory sent the requested documentation, including the loan modification application and a Hardship Affidavit to both of the assigned Wells Fargo representatives.  The Hardship Affidavit indicated that Mr. Cory's monthly expenses had increased.  Mr. Cory also included a personal letter of hardship stating that he had no cash reserves and that he was in desperate need of assistance.  The Income and Expense sheet listed regular monthly income of $5,015 and monthly overtime ranging from $345 to $564.  It also listed monthly expenses of $5,132 per month.  At the time of the application Mr. Cory's monthly PITIA payment was over $3,700.

130.    On February 4, 2011, Wells Fargo requested that Mr. Cory again send the Hardship Affidavit and a signed and dated copy of his tax return.  Mr. Cory complied with this request on February 8, 2011.

_____

131.    As part of the loan modification application process, Wells Fargo opened an escrow account for Mr. Cory's loan to pay property taxes and insurance.

132.    On February 25, 2011, Wells Fargo wrongfully denied Mr. Cory for a loan modification for not being in imminent threat of default.  Mr. Cory met all criteria to be found to be in imminent default.

133.    As a result of the wrongful denial, Mr. Cory has begun to work weekends, nights and takes on any extra "on-call" shifts in order to supplement his income.  He is not available to be there for his children.  He has sold items on EBay, reduced insurance coverage to lower the premiums, and tried to negotiate down his debt to lower his monthly bills.

134.    Mr. Cory lives paycheck to paycheck each month, and comes up short even with the additional work, requiring him to borrow money to make up the shortfall.  Due to the number of hours he must work, his health has begun to deteriorate and he suffers from chronic exhaustion, sever migraines, and leg and neck pain.

135.    Wells Fargo's actions breached the Class Action Settlement Agreement and reflect that Wells Fargo acted intentionally to prevent Mr. Cory from receiving the loan modification to which he is entitled under the Class Action Settlement Agreement.  As a result of Wells Fargo's conduct, Mr. Cory has suffered substantial damages.

136.    Wells Fargo also violated the Class Action Settlement Agreement, its incorporation of HAMP's requirements, and/or the implied covenant of good faith and fair dealing in the Class Action Settlement Agreement by establishing a mandatory escrow account for Mr. Cory's loan and requiring Mr. Cory to make monthly escrow account payments, even though Mr. Cory was never approved for a loan modification.

**Jose Cruz**

_____

137.    Jose Cruz is a resident of New Jersey and a member of Settlement Class B. He is sales director for a point of sale solutions provider. He and his wife have an infant child.

138.    On January 17, 2011, Mr. Cruz sent to Wells Fargo a completed loan modification application and Hardship Affidavit. The Hardship Affidavit indicated that his income had been reduced and that he was falling behind on all of his monthly payments. The Income and Expense sheet listed monthly income of $4,911. Not fully understanding the purpose of the expense portion of the form, Mr. Cruz listed only a monthly mortgage payment and homeowners' association dues totaling $1,923. Consistent with its "deny at all costs attitude," rather than seeking information as to any other monthly expenses, including typical necessities such as food and utilities, Wells Fargo denied Mr. Cruz's application for not being in imminent threat of default.

139.    Mr. Cruz has had to resort to borrowing money from his elderly parents and he has stopped paying other bills in order to maintain his mortgage.

140.    Wells Fargo's actions breached the Class Action Settlement Agreement and reflect that Wells Fargo acted intentionally to prevent Mr. Cruz from receiving the loan modification to which he is entitled under the Class Action Settlement Agreement. As a result of Wells Fargo's conduct, Mr. Cruz has suffered substantial damages.

**Cynthia and George Biggs**

141.    Cynthia and George Biggs are residents of Florida and members of Settlement Class B. They have been married for 27 years. The land on which their home was built had been in their family for over 40 years. They moved into their home in 1990 and raised their two children there.

CLASS ACTION COMPLAINT

142. On February 12, 2011, they contacted Wells Fargo to seek mortgage assistance. Thereafter, they submitted the complete loan modification package, including the loan modification application and Hardship Affidavit. The Hardship Affidavit reflected their need for assistance due to income reduction and insufficient liquid assets to pay their mortgage and living expenses. Their Income and Expense sheet listed monthly income of $3,750 and monthly expenses of $2,806.

143. On February 21, 2011, the Biggses received notice that a mandatory escrow account had been established by Wells Fargo.

144. On March 3, 2011 the Biggses received a letter from Wells Fargo denying their application because they were not in imminent threat of default. At the time of the denial, the Biggs owed approximately $148,000 on the loan, while the market value of their property was approximately $105,000.

145. Shortly after receiving their denial letter, they began receiving postcards from local realtors. These postcards indicated that the realtors had a relationship with Wells Fargo, such that they could assist with a fast track short sale, to prevent a foreclosure. Having no other options, and wanting to try to salvage their credit rating, they agreed to a short sale amount of $105,000, which Wells Fargo accepted. After deducting the costs of the sale, Wells Fargo obtained $86,841 as a result of the transaction.

146. Wells Fargo's actions breached the Class Action Settlement Agreement and reflect that Wells Fargo acted intentionally to prevent the Biggses from receiving the loan modification to which they are entitled under the Class Action Settlement Agreement. As a result of Wells Fargo's conduct, the Biggses have suffered substantial damages.

147.    Wells Fargo also violated the Class Action Settlement Agreement, its incorporation of HAMP's requirements, and/or the implied covenant of good faith and fair dealing in the Class Action Settlement Agreement by establishing a mandatory escrow account for the Biggses' loan and requiring the Biggses to make monthly escrow account payments, even though the Biggses were never approved for a loan modification.

**Jason Fisher**

148.    Jason Fisher is a New York resident and a member of Settlement Class B.  He is a high school math teacher, who also coaches the chess club and math team.  He, his wife and their two children have lived in their home for five years.  The Fishers' children are developmentally delayed, such that they require physical, occupational and speech therapy.  In addition, their youngest son suffers from diabetes, which requires significant medical attention as well as the need for a diabetic pump.  Mr. Fisher and his wife also care for his two disabled parents who both suffer from multiple sclerosis.

149.    On February 7, 2011, Mr. Fisher sent to Wells Fargo the loan modification application and Hardship Affidavit.  The Hardship Affidavit indicated that Mr. Fisher's hardship was caused by increased monthly expenses.  Mr. Fisher also included a personal letter indicating that his income had been reduce and he had cash reserves of only $700.  On the Income and Expense sheet, Mr. Fisher listed monthly income of $9,013.75 and monthly expenses of $5,476 which included $4,562 for his mortgage payment.  At the time of the application, Mr. Fisher owed approximately $565,000 on his loan, while the value of the property was estimated to be below that.

150.    On February 11, 2011, Mr. Fisher received a letter from Wells Fargo stating that he needed to re-send his application or Hardship Affidavit.  On February 16, 2011, he received

CLASS ACTION COMPLAINT

a denial letter from Wells Fargo indicating he was denied for a HAMP modification because he did not document a financial hardship. On the same day, he received a letter from Defendant that he was denied for a MAP2R modification due to a negative NPV result. One day later, on February 17, 2011, he received a letter from Wells Fargo stating that he was denied for a MAP2R modification because he was not in imminent threat of default.

151. Wells Fargo has never provided Mr. Fisher with an explanation as to why he was not in imminent threat of default or provided him with any supporting documentation to support the loan modification denial.

152. As a result of Wells Fargo's improper denial of his modification application, Mr. Fisher has had to apply virtually all of his money to continue making his monthly mortgage payments and avoid foreclosure, with very little money remaining to make necessary purchases.

153. Wells Fargo's actions breached the Class Action Settlement Agreement and reflect that Wells Fargo acted intentionally to prevent Mr. Fisher from receiving the loan modification to which he is entitled under the Class Action Settlement Agreement. As a result of Wells Fargo's conduct, Mr. Fisher has suffered substantial damages.

**Catherine Marsh and Walter Falkowski**

154. Catherine Marsh and Walter Falkowski ("Marsh and Falkowski") are California residents and members of Settlement Class B. They purchased their home in 1999. They are both close to 60 years of age and had planned to retire at this point in their lives. Unfortunately, due to business failures and a 30% income reduction, they have been unable to do so.

155. On February 10, 2011, they sought mortgage assistance by completing the necessary documents and faxing them to Wells Fargo, including the loan modification application and Hardship Affidavit. The Affidavit indicated that they did not have enough cash

reserves to pay their mortgage and living expenses.  They also stated in the Affidavit that their mortgage payment was increasing every year, but their income was not.  The Income and Expense sheet showed monthly income of $8,583 and monthly expenses of $4,430.  At the time of the application, their monthly PITIA payments were approximately $3,080.  The balance on the loan at that time was approximately $506,000, while the market value of their home was approximately $430,000.

156.    On February 16, 2011, Wells Fargo sent Marsh and Falkowski a letter indicating that their file was under review.  Wells Fargo also sent Marsh and Falkowski a letter that same day stating that a mandatory escrow account had been established.

157.    On February 21, 2011, Marsh and Falkowski received a denial letter from Wells Fargo stating that their application under HAMP had been denied for failing to document a hardship.  On February 22, 2011, Wells Fargo sent an additional denial letter indicating that Marsh and Falkowski were denied for a MAP2R modification for failing to document a hardship.

158.    As a result of the wrongful denial, Marsh and Falkowski have terminated their cable, and land and cell phone service, and they can only afford to purchase discounted food from the market at which Mr. Falkowski works.  They have suffered severe anguish at having to let friends know of their dire financial circumstances.

159.    Wells Fargo's actions breached the Class Action Settlement Agreement and reflect that Wells Fargo acted intentionally to prevent Marsh and Falkowski from receiving the loan modification to which they are entitled under the Class Action Settlement Agreement.  As a result of Wells Fargo's conduct, Marsh and Falkowski have suffered substantial damages.

160.     Wells Fargo also violated the Class Action Settlement Agreement, its incorporation of HAMP's requirements, and/or the implied covenant of good faith and fair dealing in the Class Action Settlement Agreement by establishing a mandatory escrow account for the Marsh and Falkowski loan and requiring Marsh and Falkowski to make monthly escrow account payments, even though Marsh and Falkowski were never approved for a loan modification.

**Mary and Greg Slade**

161.     Mary and Greg Slade are residents of Illinois and members of Settlement Class B.  They have been married for 20 years and purchased their home as newlyweds 19 years ago.  Their 16-year old daughter has grown up in their family home.  They are both self-employed -- Mrs. Slade is a Mary-Kay consultant and Mr. Slade services fireplaces.

162.     On June 7, 2011, they sought mortgage assistance by sending Wells Fargo a loan modification application and a Hardship Affidavit.  The Affidavit indicated that their hardship was based upon a reduction of income, increase in expenses, and no cash reserves to cover living expenses.  The Income and Expense sheet showed monthly income of $3,280 and monthly expenses of $3,984.  Of the listed expenses, $1,585 was for the monthly PITIA payment.  At the time of the application they owed approximately $192,000 on their loan, while their home was only worth approximately $150,000.

163.     On June 9, 2011, Wells Fargo sent the Slades a letter requesting additional documentation, which they sent to Wells Fargo the same day.  On June 10, 2011, Wells Fargo sent a letter to the Slades indicating that their file was under review.  On June 17, 2011, they received a denial letter from Wells Fargo indicating they were denied for a HAMP modification because of excessive financial obligations.  They never received a letter from Wells Fargo

stating whether, or why, they were denied for MAP2R modification, but according to a report provided by Wells Fargo to Class Counsel, the denial was because the "Excessive Forbearance-threshold cannot be reached." Wells Fargo has never explained the meaning of that language and the term "Excessive Forbearance" does not appear anywhere in the Class Action Settlement Agreement. This denial was improper, as the financial information submitted by the Slades and the value of their home justified a MAP2R loan modification.

164. The wrongful denial has caused the Slades to withdraw retirement savings in order to stay current on their mortgage. They pay their taxes and insurance using credit cards that carry exorbitant interest charges. They no longer have any savings, and fear they will be unable to make their mortgage payments and avoid foreclosure.

165. Wells Fargo's actions breached the Class Action Settlement Agreement and reflect that Wells Fargo acted intentionally to prevent the Slades from receiving the loan modification to which they are entitled under the Class Action Settlement Agreement. As a result of Wells Fargo's conduct, the Slades have suffered substantial damages.

**Joseph Midgette**

166. Joseph Midgette is a District of Columbia resident and a member of Settlement Class B. He is a retired veteran who suffers from many medical conditions, including Hepatitis C which he contracted while in the army, prostate cancer, kidney failure, and diabetes. As a result, he is unable to work.

167. On or about April 30, 2011, Mr. Midgette contacted Wells Fargo about mortgage assistance. On May 2, 2011, with his wife's assistance he sent to Wells Fargo a completed loan modification application with a Hardship Affidavit. The Hardship Affidavit indicated that he had reduced income and increased expenses. He also sent a personal letter stating that he could

not work because of the medical conditions listed in that letter.  The Income and Expense sheet listed monthly income of $1,903 ($520 per month from Social Security and $1,383 per month from pension or retirement income).  The only monthly expense he listed was $855 for housing. At the time of the application, he owed approximately $175,000 on the loan, while the market value of his home was approximately $145,000.

168.    On May 6, 2011, Mr. Midgette received a letter from Wells Fargo indicating that his file was under review.  On May 13, 2011, he received a denial letter from Wells Fargo stating that his application was denied under HAMP for failing to document a financial hardship.  The portion of the letter describing the reason for denial under MAP2R was left blank.  According to a report provided by Wells Fargo to Class Counsel, Mr. Midgette was denied for a MAP2R modification because of a negative NPV result.  This denial was improper, as the financial information submitted by Mr. Midgette and the market value of his home should have led to a positive NPV result.

169.    Wells Fargo never provided Mr. Midgette with the NPV printout showing the inputs that it used for the NPV calculation.  Mr. Midgette believes that Wells Fargo must have improperly valued his home above the amount he owed, as that would be the only way to determine that foreclosure would be preferable to modification.

170.    If Wells Fargo had properly conducted the NPV analysis, including by using a correct property value from an independent appraisal, it would have yielded a positive result and Mr. Midgette would have received a MAP2R loan modification.  The wrongful denial of the modification has caused him and his family to choose between purchasing necessities or paying the mortgage.  The Midgettes avoid using their vehicle in order to save money on gas and Mrs. Midgette has had to take any odd job she can find to provide additional income.

CLASS ACTION COMPLAINT

Because of Mr. Midgette's deteriorating health and his wife having to take any work that is available, their marriage is suffering.

171.    Wells Fargo's actions breached the Class Action Settlement Agreement and reflect that Wells Fargo acted intentionally to prevent Mr. Midgette from receiving the loan modification to which he is entitled under the Class Action Settlement Agreement.  As a result of Wells Fargo's conduct, Mr. Midgette has suffered substantial loss of money and damages including damages as a result of extreme emotional distress, including constant stress, anxiety, and embarrassment which have affected his relationships and his daily life.

**Jennifer Murphy**

172.    Jennifer Murphy is a California resident and a member of Settlement Class B. She is a single mother of twins and has lived in her current home with her children for most of their lives.  Ms. Murphy teaches special needs children in the seventh grade.

173.    In late 2011, Ms. Murphy fell behind on her payments and was in default on her loan in late 2011.  On December 29, 2011, she faxed documents to Wells Fargo, including her loan modification application and Hardship Affidavit.  The Hardship Affidavit indicated that her income had been reduced, her expenses had increased, and that she did not have cash reserves upon which to rely.  She also indicated in a personal letter that her ex-husband had lost his job, such that she was not receiving regular child support payments.  On the Income and Expense sheet, she listed monthly income of $6,468 and monthly expenses of $3,986.  At the time of her application, Ms. Murphy's PITIA payments were approximately $2,490; she owed approximately $433,700 on the loan, while her home had a market value of $385,000.

174.    On February 25, 2012, Wells Fargo denied Ms. Murphy's loan modification application because she did not document a financial hardship.  On March 1, 2012, she faxed to

CLASS ACTION COMPLAINT

Wells Fargo a letter indicating that she had a financial hardship and the reasons for it. The next day, March 2, 2012, Wells Fargo sent her a letter indicating that there was nothing they could do for her. Wells Fargo sent her the same letter again on April 16, 2012.

175. On April 29, 2012, she received a letter indicating that Wells Fargo intended to commence foreclose proceedings if she did not pay all past due amounts owed on her loan. The letter also invited her to apply for a loan modification.

176. On June 27, 2012, Ms. Murphy reapplied for a loan modification. On July 12, 2012, she was again denied by Wells Fargo for failure to document a financial hardship. On July 17 and 20, 2012, she received the same letter she had already received twice informing her that there was nothing Wells Fargo could do for her.

177. Ms. Murphy provided all the required documentation and documented a financial hardship. As a result of Wells Fargo's wrongful denial, she has had to resort to removing her children from extracurricular activities, and generally given up on any social activities that required even the smallest expenditures.

178. Wells Fargo's actions breached the Class Action Settlement Agreement and reflect that Wells Fargo acted intentionally to prevent Ms. Murphy from receiving the loan modification to which she is entitled under the Class Action Settlement Agreement. As a result of Wells Fargo's conduct, Ms. Murphy has suffered substantial damages.

**Nathan Ranger**

179. Nathan Ranger is an Oregon resident and a member of Settlement Class B. He and his wife have lived in their home since 2005.

180. After applying for a loan modification via telephone, Mr. Ranger provided the necessary documents to Wells Fargo. The Hardship Affidavit listed both increased monthly

expenses and reduced income as the reason for his hardship.  The Income and Expense sheet showed $5,852 in monthly income and $4,976 in monthly expenses, including a monthly PITIA payment of approximately $2,200.

181.    On March 16, 2012, Wells Fargo denied Mr. Ranger's application for a loan modification due to a negative NPV result.

182.    According to Wells Fargo, the home had a market value of $540,000 at that time. On April 10, 2012, Mr. Ranger contested that valuation because it was based upon an automated valuation methodology, rather than an independent appraisal.  An independent appraisal that Mr. Ranger paid for revealed that the actual market value of the property at that time was approximately $375,000.

183.    In addition to the grossly inflated market value, Wells Fargo used other incorrect information for its NPV calculations.  The NPV worksheet revealed that Wells Fargo improperly characterized Mr. Ranger's loan as a fixed rate loan, and it used an incorrect credit rating and a monthly income figure that was unrelated to the documentation Mr. Ranger provided to Wells Fargo.

184.    If Wells Fargo had properly computed the NPV, it would have had a positive result and an affordable payment for Mr. Ranger would have been reached.  Instead, it wrongfully denied the loan modification and Mr. Ranger remains in default.  Wells Fargo has pursued a foreclosure and has previously sent Mr. Ranger a Notice of Default.  Wells Fargo is likely to reset a foreclosure date shortly.

185.    Wells Fargo's actions breached the Class Action Settlement Agreement and reflect that Wells Fargo acted intentionally to prevent Mr. Ranger from receiving the loan

modification to which he is entitled under the Class Action Settlement Agreement.  As a result of Wells Fargo's conduct, Mr. Ranger has suffered substantial damages.

**Sherri Goldfinch**

186.    Sherri Goldfinch is a California resident and a member of Settlement Class B. She has lived in her home for the past 25 years.  In November 2011, Ms. Goldfinch sought mortgage assistance from Wells Fargo by telephone.  Throughout the next ten months she responded promptly to countless requests for documents from Wells Fargo, yet Wells Fargo kept denying her loan modification applications.

187.    On September 6, 2012, Ms. Goldfinch reapplied for a loan modification.  Her Hardship Affidavit stated she had no cash reserves, she was unemployed and collecting social security, and her expenses had increased.  Her application included a benefits statement showing that her monthly gross income from social security was $1,717 gross.  At the time, she owed approximately $136,000 on her loan and her monthly PITIA payments were approximately $675.

188.    On October 31, 2012, Wells Fargo once again denied Ms. Goldfinch's loan modification application.  An NPV breakdown sent to her by Wells Fargo reflected that the NPV calculation had used a market value for her home of $136,000, even though she had previously informed Wells Fargo that the market value of her home was closer to $110,000.

189.    After the denial, Wells Fargo informed Ms. Goldfinch that it would commence foreclosure proceedings if she did not agree to a short sale.  Not wanting the stigma of a foreclosure, Ms. Goldfinch agreed to allow a short sale.  The closing of the short sale is set to take place in January 2013.  Wells Fargo has agreed to accept a sales price of $125,000, which will net it approximately $110,000.

CLASS ACTION COMPLAINT

190.     Wells Fargo's actions breached the Class Action Settlement Agreement and reflect that Wells Fargo acted intentionally to prevent Ms. Goldfinch from receiving the loan modification to which she is entitled under the Class Action Settlement Agreement.  As a result of Wells Fargo's conduct, Ms. GoldFinch has suffered substantial loss of money damages.

**Carrie Rosillo**

191.     Carrie Rosillo is a California resident and a member of Settlement Class C.  She has lived in her home for the past 20 years, where she raised her two children  She has been the primary caregiver for her developmentally disabled sister for the past five years, while also working full-time to support her household.

192.     Ms. Rosillo has applied to Wells Fargo numerous times for mortgage assistance, but she was denied each time for not being in imminent threat of default.  At the time of the denials, Ms. Rosillo was in actual default on her mortgage loan.  Moreover, as a member of Settlement Class C, she is not required to show that she is in default or imminent threat of default in order to receive a MAP2R modification.

193.     After improperly denying her loan modification application, Wells Fargo informed Ms. Rosillo that she needed to pay the amount in arrears on her loan or it would foreclose.  She had to borrow $24,000 from her terminally ill father to pay Wells Fargo to prevent a foreclosure.

194.     Wells Fargo's actions breached the Class Action Settlement Agreement and reflect that Wells Fargo acted intentionally to prevent Ms. Rosillo from receiving the loan modification to which she is entitled under the Class Action Settlement Agreement.  As a result of Wells Fargo's conduct, Ms. Rosillo has suffered substantial money damages.

**Carlton and Katheryn Hinkle**

195.     Carlton and Katheryn Hinkle are residents of California and members of Settlement Class B.  The Hinkles have a veterinary hospital providing care to animals.

196.     On August 2, 2011 the Hinkles sent in their loan modification application and Hardship Affidavit to Wells Fargo.  The Hardship Affidavit indicated they had increased expenses, reduced income and little cash reserves upon which to rely.  Their Income and Expense sheet showed monthly income of $13,720 and a monthly PITIA expense of approximately $5,020.

197.     During the application process, Mr. Hinkle offered numerous times to provide necessary tax documentation directly to the Hinkles' "single point of contact," Home Preservation Specialist, Heath Gillespie, but he was rebuffed each time as Mr. Gillespie claimed it was easier for Wells Fargo to request the information directly from the IRS.  Nevertheless, the Hinkles' modification application was terminated on September 22, 2011 because the Hinkles "did not provide the documents requested.  A notice that listed the specific documents needed and the timeframe required to provide them was sent more than 30 days ago."  However, the Hinkles never received a written request for documents.  Thus, Wells Fargo improperly categorized the Hinkles' modification application as a Fall-Out.

198.     As a result of the wrongful denial of their loan modification request, they have drained all of his savings, maxed out the line of credit from Mr. Hinkle's business and they have borrowed $92,000 from Mrs. Hinkle's mother in order to keep current on their mortgage and avoid default.

199.     Wells Fargo's actions breached the Class Action Settlement Agreement and reflect that Wells Fargo acted intentionally to prevent the Hinkles from receiving the loan

CLASS ACTION COMPLAINT

modification to which they are entitled under the Class Action Settlement Agreement.  As a result of Wells Fargo's conduct, the Hinkles have suffered substantial damages.

## VI.

## CLASS ACTION ALLEGATIONS

200.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

201.     Plaintiffs bring this action on behalf of themselves and all others similarly situated, pursuant to Federal Rule of Civil Procedure 23(a) and (b).  The Class and SubClasses that Plaintiffs seek to represent are defined as follows:

(a)  **Rule 23(b)(2) Injunctive Relief Class:**  All persons who are members of "Settlement Class B" or "Settlement Class C" in *In re Wachovia Corp. "Pick-A-Payment" Mortgage Marketing and Sales Practices Litigation*, N.D. Cal. Case No. M:09-CV-2015-JF, and have not received a mortgage loan modification pursuant to the Agreement and Stipulation of Settlement of Class Action in the *In re Wachovia Corp.* litigation that was finally approved by the Northern District of California (Hon. Jeremy M. Fogel) on May 17, 2011.

(b)  **Rule 23(b)(3) Damages SubClass:**  All members of the above Rule 23(b)(2) Injunctive Relief Class who have applied for a mortgage loan modification on or after December 18, 2010 and had their application denied by Defendants.

(c)  **Improper Escrow Account Sub-SubClass:**  All members of the above Rule 23(b)(3) Damages SubClass who did not make monthly payments to Defendant Wells Fargo Home Mortgage or Wells Fargo Bank, N.A. for an escrow account before they applied for a loan modification and were required by Defendants to

62

start making monthly escrow payments as part of the loan modification

application process.

Plaintiffs reserve the right to amend or otherwise alter the Class definitions presented to the

Court at the appropriate time, or to propose or eliminate SubClasses in response to facts learned

through discovery or legal arguments advanced by Defendants or otherwise.

202.     <u>Numerosity</u>:  The Class, SubClass and Sub-SubClass are so numerous that

individual joinder of all members thereof is impracticable under the circumstances of this case.

While the exact numbers of Class, SubClass and Sub-SubClass members are unknown at this

time, Plaintiffs are informed and believe that the proposed Class, SubClass and Sub-SubClass

each consist of thousands of members.

203.     <u>Commonality</u>:  Common questions of law or fact, which have common answers,

are shared by Class, SubClass and Sub-SubClass members.  Such common questions include,

but are not limited to, any one or more of the following:

(a)     Whether Defendants provided sufficient staffing to accurately and

properly evaluate loan modification applications pursuant to the Class Action Settlement

Agreement;

(b)     Whether Defendants adequately trained and supervised their Home

Preservation Specialist employees to accurately and properly apply the loan modification

eligibility criteria under the Class Action Settlement Agreement with respect to any one or more

of the following:

(i)     Calculation of Class members' income and assets;

(ii)     Determination of Class member "hardship" eligibility for loan

modification;

CLASS ACTION COMPLAINT

(iii)  Application of the Class Action Settlement Agreement's "Waterfall" steps for determining the appropriate loan modification elements;

(iv)  Screening out consideration of any factors for determining loan modification eligibility other than those expressly set forth in the Class Action Settlement Agreement;

(v)  Providing accurate and timely information about loan modification eligibility under the Class Action Settlement Agreement to Class and SubClass members;

(vi)  Retention of documentation provided by Class and SubClass members pertaining to their eligibility for loan modification under the Class Action Settlement Agreement.

(c)  Whether Defendants utilized an appraisal methodology that accurately valuated Class and SubClass members' secured residential properties for purposes of determining their eligibility for loan modifications pursuant to the Class Action Settlement Agreement;

(d)  Whether Defendants applied the Net Present Value Test ("NPV Test") in assessing Class and SubClass members' requests for loan modifications in accordance with the requirements of the Class Action Settlement Agreement;

(e)  Whether Defendants permissibly required Sub-SubClass members to accept escrow account for the lives of their loans as a condition of the loan application process;

(f)  Whether Defendants breached the Class Action Settlement Agreement and/or its implied covenant of good faith and fair dealing in performing or by failing to perform

any one or more of their duties in enforcing the Class Action Settlement Agreement set forth in subsections (a)-(e) above;

(g)     Whether Defendants' systematic breaches of the Class Action Settlement Agreement and/or its implied covenant of good faith and fair dealing with respect to any one or more of their duties set forth in subsections (a)-(e) above constitute an "Unfair" business practice in violation of the UCL; and

(h)     Whether Defendants' systematic breaches of the Class Action Settlement Agreement, which was approved by the Court through a final order and judgment in which the Court expressly retained jurisdiction over Settlement enforcement, with respect to any one or more of their duties set forth in subsections (a)-(e) above constitute an "Unlawful" business practice in violation of the UCL.

204.    <u>Typicality</u>: Plaintiffs' claims are typical of the claims of absent Class and SubClass members.  Plaintiffs, like all Class members, are Settlement Class B or Settlement Class C members in the Wachovia Class Action who have not received loan modifications pursuant to the Class Action Settlement Agreement.  Plaintiffs, like all SubClass members, also have applied for loan modifications pursuant to the Class Action Settlement Agreement and were denied by Defendants.  Plaintiffs thus were subjected to the same kinds of unlawful and unfair conduct as were Class and SubClass members, and their claims are based on the same legal theories.

205.    Plaintiffs Thomas and Linda Geremia, Julie A. and David W. Young, Jeff Cory, Cynthia and George Biggs, and Catherine Marsh and Walter Falkowski (collectively, the "Improper Escrow Account Plaintiffs") also have claims that are typical of the Improper Escrow Account Sub-SubClass in that they, like all Sub-SubClass members, did not make monthly

_____

escrow account payments to Defendants before applying for a loan modification, and were required by Defendants to start making monthly escrow account payments as part of the loan modification application process.

206.    Adequacy:  Plaintiffs are adequate representatives of the Class and SubClass they seek to represent because their interests do not conflict with the interests of the other members of the Class and SubClass.  The Improper Escrow Account Plaintiffs also are adequate representatives of the Improper Escrow Account Sub-SubClass because their interests do not conflict with the interests of the other members of the Sub-SubClass.  Plaintiffs have retained counsel who are competent and experienced in complex class action litigation and who will vigorously prosecute this action.  The interests of Class Members will be fairly and adequately protected by Plaintiffs and their counsel.

207.    Ascertainable Class:  The proposed Class, SubClass, and Sub-SubClass are ascertainable in that the members can be identified and located using information contained in Defendants' mortgage lending and Class Action Settlement Agreement implementation records.

208.    This case is brought and can be maintained as a class action under Rule 23(b)(2) and/or Rule 23(b)(3):

(a)    Injunctive and/or Declaratory Relief to the Class is Appropriate: Defendants, and each of them, have acted or refused to act on grounds generally applicable to the Class, thereby making final injunctive relief and/or corresponding declaratory relief with respect to the Class as a whole appropriate;

(b)    Predominant Questions of Law or Fact:  Questions of law or fact common to all SubClass and Sub-SubClass members, including those identified above, predominate over questions affecting only individual SubClass or Sub-SubClass members, and

a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class action treatment will allow a large number of similarly situated consumers to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would require. Moreover, absent a class-wide treatment of this controversy, the amount of individual SubClass or Sub-SubClass members' losses in comparison to the enormous cost of litigation makes it likely that few SubClass or Sub-SubClass members would be able to seek or obtain redress for their injuries.

**VII.**

**<u>FIRST CLAIM FOR RELIEF</u>**

**Breach of Contract**

**(All Plaintiffs on behalf of Class and SubClass against all Defendants and Improper Escrow Account Plaintiffs also on behalf of Improper Escrow Account Sub-SubClass against Defendants Wells Fargo Home Mortgage and Wells Fargo Bank, N.A.)**

209. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

210. The Class Action Settlement Agreement executed by Defendants and approved by the Court became effective on September 7, 2011.

211. Defendants have acknowledged that Settlement Class Members have standing to enforce the terms of the Class Action Settlement Agreement.

212. Section VI(E) of the Class Action Settlement Agreement obligated Defendants to administer the MAP2R loan modification program described therein, and set forth above, and to

make that program available to all Settlement Class members from December 18, 2010 through June 30, 2013.

213.    Section VI(E)(7) of the Class Action Settlement Agreement required that "[i]n determining the documents required of Settlement Class Members to apply for MAP2R Modifications, the Defendants, consistent with their need to obtain relevant financial information, will seek to minimize the burden on Settlement Class Members and maximize participation in the MAP2R Modification program."

214.    Section VI(E)(8) of the Class Action Settlement Agreement contained "servicing commitments made by Defendants in connection with their administration of the MAP2R program, including requirements that Defendants 1) notify Settlement Class Members in writing within ten (10) business days of their submitting a modification request of any documents believed to be missing and necessary for evaluation for a MAP2R Modification; 2) provide Settlement Class Members who do not qualify for HAMP or MAP2R Modifications, within thirty (30) calendar days of the Defendants' receipt of all required documentation from the Settlement Class Member, with a written explanation, which shall be copied to Lead Class Counsel, which clearly explains the reasons that the modification was denied; and 3) establish a formal second-look and escalation protocol for all Settlement Class B Members and Settlement Class C Members seeking a loan modification."

215.    Defendants breached their obligations under the Class Action Settlement Agreement by 1) failing to make MAP2R loan modification determinations in accordance with the Class Action Settlement Agreement; 2) failing to implement and/or follow guidelines regarding document submission that "minimize the burden on Settlement Class Members and maximize participation in the MAP2R Modification program"; and 3) failing to comply with the

servicing commitments in the Class Action Settlement Agreement, as set forth in paragraph 28(8) above.

216.     Defendants have also failed to comply with their servicing commitments, as they never provided Class Counsel with a written explanation for each denial which clearly explains the reasons that the modification was denied.  Additionally, with respect to the Improper Escrow Account Plaintiffs, and all other members of the Improper Escrow Account Sub-SubClass, Wells Fargo has further breached Section VI(E)(3) of the Class Action Settlement Agreement, which prohibits  assessment of any fees to Settlement Class Members as a precondition to a MAP2R loan modification, by requiring these Plaintiffs and Sub-SubClass members to agree to make monthly escrow payments for the lives of their loans as a pre-condition to a modification when Treasury Department guidelines only permit this upon the grant of a HAMP modification.

217.     Additionally, with respect to the Improper Escrow Account Plaintiffs, Wells Fargo has further breached the Class Action Settlement Agreement, wherein Defendants agreed in Section 6.E.3 that they would not assess any fees to Settlement Class Members as a precondition to a MAP2R loan modification, by requiring these Plaintiffs and Sub-SubClass members to agree to make monthly escrow payments for the lives of their loans as a pre-condition to a modification when Treasury Department guidelines only permit this upon the grant of a HAMP modification. This impermissibly and significantly increased their monthly payment obligations after Wells Fargo denied their applications for loan modifications.

218.     Plaintiffs, on the other hand, have fulfilled their obligations with respect to the MAP2R loan modification program by providing Wells Fargo with all of the documents

necessary to apply for a MAP2R loan modification and providing all additional (or duplicate) documents requested by Wells Fargo orally or in writing.

219.  As a result of these breaches of the Class Action Settlement Agreement, Plaintiffs have suffered harm.  Plaintiffs have not been able to obtain the loan modifications to which they are entitled under the Class Action Settlement Agreement, which Defendants have valued at an average of $147,163 per modification.  As a result of Defendants' breaches, Plaintiffs have incurred, and many Plaintiffs will continue to incur, additional interest charges at higher rates than they should be paying if the loan was properly modified and other consequential damages, including damages resulting from lowered credit scores.  Furthermore, Defendants' breaches that have prevented Plaintiffs from obtaining the loan modifications to which they are entitled have placed some Plaintiffs in danger of losing their homes through foreclosure, while other Plaintiffs have lost their homes through foreclosure due to the inability to make the unmodified monthly mortgage payments.

220.  WHEREFORE, Plaintiffs are entitled to compensatory damages proximately caused by Defendants' breach of contract as alleged herein, consequential damages, pre-judgment interest, costs of suit and other relief as the Court deems just and proper.

### VIII.

### SECOND CLAIM FOR RELIEF

**Breach of the Implied Covenant of Good Faith and Fair Dealing**

**(All Plaintiffs on behalf of Class and SubClass against All Defendants and Improper Escrow Account Plaintiffs also on behalf of Improper Escrow Account Sub-SubClass against Defendants Wells Fargo Home Mortgage and Wells Fargo Bank, N.A.)**

221.  Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

222.     Defendants breached the covenant of good faith and fair dealing implied in the Class Action Settlement Agreement.

223.     The implied covenant of good faith and fair dealing imposes upon Defendants, and each of them, the duty not to frustrate Plaintiffs' enjoyment of their rights under the Class Action Settlement Agreement.

224.     Plaintiff performed all conditions, covenants, and promises required to be performed in accordance with the agreement.

225.     On information and belief, Plaintiffs allege that Defendants, and each of them, in doing the acts alleged herein, have breached the covenant of good faith and fair dealing implied in the Class Action Settlement Agreement in that they, in bad faith and with a motive to intentionally frustrate Plaintiffs' exercise of their rights under the Agreement, have perpetrated the above-described acts and omissions.  As set forth above, in addition to wrongfully denying loan modification applications, Wells Fargo has repeatedly asked Plaintiffs for multiple copies of the same documents, used incorrect information when evaluating loan modification applications, failed to respond to inquiries from Plaintiffs on a timely basis or at all, failed to provide borrowers with written denial letters and the reasons for denials, and failed to provide Class Counsel with sufficient written explanations for the MAP2R denials.   These actions have frustrated Plaintiffs' ability to obtain the MAP2R loan modifications to which they are entitled. Additionally, these actions reflect that Wells Fargo has also frustrated Plaintiffs' ability to obtain the MAP2R loan modification to which they are entitled by intentionally not hiring a sufficient number of qualified employees to administer the MAP2R program and by willfully failing to properly train the employees that it has assigned to the MAP2R loan modification program.

CLASS ACTION COMPLAINT

226.     Additionally, with respect to the Improper Escrow Account Plaintiffs, Wells Fargo has further breached the covenant of good faith and fair dealing implied in the Class Action Settlement Agreement, wherein Defendants agreed in Section 6.E.3 that they would not assess any fees to Settlement Class Members as a precondition to a MAP2R loan modification, by requiring these Plaintiffs and Sub-SubClass members to agree to make monthly escrow payments for the lives of their loans as a pre-condition to a modification when Treasury Department guidelines only permit this upon the grant of a HAMP modification. This significantly increased their monthly payment obligations after Wells Fargo denied their applications for loan modifications.  These actions frustrated the Improper Escrow Account Plaintiffs' ability to afford their monthly mortgage payment obligations, the facilitation of which was the purpose of the Class Action Settlement Agreement's loan modification benefit, by increasing their payment amounts over their pre-modification application obligations.  These actions further frustrated the Improper Escrow Account Plaintiffs' ability to stay in their homes, the facilitation of which was the purpose of HAMP that was incorporated into the Class Action Settlement Agreement.

227.     WHEREFORE, Plaintiffs are entitled to compensatory damages proximately caused by Defendants' breach of the implied covenant of good faith and fair dealing as alleged herein, consequential damages, pre-judgment interest, costs of suit and other relief as the Court deems just and proper.

### IX.

### THIRD CLAIM FOR RELIEF

**Violation of California's Unfair Competition Law,**

**Bus. & Prof. Code §§ 17200 *et seq.***

**"Unlawful"and "Unfair" Business Acts or Practices**

CLASS ACTION COMPLAINT

**(All Plaintiffs on behalf of Class and SubClass against All Defendants and Improper Escrow Account Plaintiffs also on behalf of Improper Escrow Account Sub-SubClass against Defendants Wells Fargo Home Mortgage and Wells Fargo Bank, N.A.)**

228. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

229. This claim is brought by Plaintiffs individually, as representatives on behalf of the Class and SubClass members, by the Improper Escrow Account Plaintiffs also on behalf of Improper Escrow Account Sub-SubClass members, and by Plaintiffs in their capacities as private attorneys general, against all Defendants for their unlawful, unfair and fraudulent business acts and/or practices pursuant to the California Business & Professions Code sections 17200, *et seq.* ("UCL"), which prohibits unlawful, unfair and/or fraudulent business acts and/or practices.

230. Plaintiffs assert these claims as representatives of an aggrieved group and as private attorneys general on behalf of the general public and other persons who have expended funds that the Defendants should be required to pay or reimburse under the restitutionary remedy provided by California Business & Professions Code sections 17200, *et seq.*

231. The instant claim is predicated on both the generally applicable duty of any contracting party to honor the letter and spirit of its agreement to enable the other contracting parties to realize their intended benefits of the agreement, and the duty at law to comply with the order of a court granting final approval of a contractual settlement agreement through a final judgment order in which the court expressly retained jurisdiction over the settlement agreement's enforcement. Plaintiffs and Class and SubClass members hereby seek to enforce a general proscription of unfair business practices and the requirement to refrain from unlawful and unfair conduct.

73

CLASS ACTION COMPLAINT

232.    Plaintiffs and Class and Subclass members are consumers who settled their underlying claims alleging violations of applicable federal and state laws pertaining to Defendants' predatory and deceptive mortgage lending practices for valuable consideration in the form of direct monetary relief and eligibility for modification of existing mortgage loans on terms explicitly set forth in the Class Action Settlement Agreement discussed herein.  Prior and subsequent to the Court's final approval, Defendants have engaged in a course of conduct whose effect has been to deprive Plaintiffs and Class and SubClass members of their intended loan modification benefits under the Class Action Settlement Agreement by failing to hire sufficient staffing or provide adequate training or supervision of staff tasked with processing loan modification requests in accordance with the terms of the Class Action Settlement Agreement and by utilizing inaccurate calculations of property values and borrower incomes and assets and relying upon unauthorized criteria not set forth in the Class Action Settlement Agreement, all resulting in denials of requests for loan modifications to which Class and SubClass members are entitled.

233.    As a result of Defendants' conduct in violation of the letter and intent of the Class Action Settlement Agreement, thousands of Class and SubClass members have been denied or deterred from obtaining mortgage loan modifications to which they are entitled under the Class Action Settlement Agreement and thus have lost thousands of dollars or more in out of pocket expenses on loan repayment, in increased indebtedness, and/or in related expenses incurred as a result of not being given a loan modification in accordance with the Class Action Settlement Agreement.

234.     By engaging in the above-described acts and practices, Defendants, and each of them, have committed one or more acts of unfair competition within the meaning of California Business & Professions Code §§ 17200, *et seq.*

235.     <u>Unlawful</u>:  The unlawful acts and practices of Defendants alleged above constitute unlawful business acts and/or practices within the meaning of California Business & Professions Code §§ 17200, *et seq.*  These predicate unlawful business acts and/or practices include, but are not limited to, the breach of a contractual settlement agreement and the violation of a court's final judgment order approving the settlement agreement and expressly retaining jurisdiction over its enforcement.

236.     Defendants' breaches of the Class Action Settlement Agreement, both intentional and otherwise, constitute violations of the court order approving the Settlement and retaining jurisdiction over its enforcement.  These breaches of both the Class Action Settlement Agreement and the Court's Final Approval Order to the detriment and out-of-pocket losses of Plaintiffs and thousands of Class and SubClass members constitute unlawful business practices within the meaning of California Business & Professions Code §§ 17200, *et seq.*

237.     <u>Unfair</u>: Defendants' conduct as alleged in this action constitutes negligence and other tortious conduct and this misconduct gave Defendants an unfair competitive advantage over competitors that did not engage in the same misconduct.

238.     Defendants' misconduct as alleged above and herein was unfair because (i) it caused Plaintiffs and Class, SubClass and Sub-SubClass members substantial injury by, among other things, depriving them of contractually-guaranteed rights under the Class Action Settlement Agreement for which they released valuable legal claims and causing them to incur additional out-of-pocket expenses in repaying their mortgage loans or additional indebtedness

75

secured by their homes as a result of being denied loan modifications; (ii) there were no countervailing benefits to consumers or to competition that could possibly outweigh this substantial injury; and (iii) this injury could not have been avoided by consumers because it resulted from Defendants' exercise of control over the servicing of Plaintiffs' and Class, SubClass and Sub-SubClass members' mortgage loans.

239.    The misconduct of Defendants alleged herein violated the public policy in favor of consensual resolution of litigation through settlement agreements in which often-valuable legal claims are released in exchange for valuable consideration in the form of immediately available relief, which public policy is undermined here by Defendants' misconduct that rendered the most valuable consideration of the Class Action Settlement Agreement illusory for Plaintiffs and Class, SubClass and Sub-SubClass members.

240.    The harm to Plaintiffs, Class, SubClass and Sub-SubClass members, and members of the general public outweighs the utility of Defendants' conduct, and consequently Defendants' conduct herein constitutes an unfair business act or practice within the meaning of California Business & Professions Code §§ 17200, *et seq.* Defendants' misconduct as alleged herein also gave Defendants an unfair competitive advantage over their competitors that did not engage in similar misconduct.

241.    As a direct and proximate result of the aforementioned misconduct, Defendants and each of them received monies and continued to hold the monies expended by Plaintiffs and Class, SubClass and Sub-SubClass members similarly situated who were denied loan modifications to which they were entitled under the Class Action Settlement Agreement as described herein.

242.     The unlawful and unfair business practices of Defendants as fully described herein present a continuing threat to Plaintiffs and Class, SubClass and Sub-SubClass members to be misled and/or deceived by Defendants' conduct in misrepresenting or inaccurately determining their eligibility for mortgage loan modifications under the Class Action Settlement Agreement that released their underlying federal and state law claims challenging Defendants' predatory and deceptive mortgage lending practices.

243.     As a direct and proximate result of Defendants' unlawful and unfair conduct alleged herein, Plaintiffs and Class, SubClass and Sub-SubClass members have lost hundreds of thousands if not millions of dollars in out of pocket expenses and lost equity in their homes. Plaintiffs and Class, Subclass and Sub-SubClass members are direct victims of the Defendants' unlawful and unfair conduct, and each has suffered injury in fact and has lost money or property as a result of Defendants' unfair competition.

244.     WHEREFORE, Plaintiffs and Class, SubClass and Sub-SubClass members are entitled to equitable relief, including restitution, restitutionary disgorgement of all profits accruing to Defendants because of their unlawful and unfair acts and/or practices, attorneys' fees and costs, declaratory relief, and a preliminary and permanent injunction enjoining Defendants from their unlawful, unfair, and fraudulent misconduct.

## X.

### FOURTH CLAIM FOR RELIEF

**Remedies Available Under All Writs Act, 28 U.S.C. § 1651(a),**

**And Pursuant to Court's Equitable Powers to Enforce**

**Court-Approved Settlement Agreement**

**(All Plaintiffs on behalf of the Class against All Defendants)**

245.     Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

CLASS ACTION COMPLAINT

246.     Defendants' bad faith misconduct in violation of the letter and intent of the Class Action Settlement Agreement as set forth herein undermines and threatens to further undermine the validity of the Court's final judgment order finding the Class Action Settlement Agreement to be a fair, reasonable, and adequate resolution of class members' claims in the Wachovia Class Action, and retaining jurisdiction over the Class Action Settlement Agreement's enforcement.  Defendants' conduct undermines and threatens to further undermine the Court's final judgment order by depriving Class and SubClass members of the consideration to which they were entitled that rendered the release of their federal and state-law claims challenging Defendants' predatory and deceptive mortgage lending practices fair, reasonable, and adequate in the Court's order.  Absent the consideration in the form of eligibility for mortgage loan modifications to which they are entitled, the Court's final approval order is substantially undermined.

247.     Defendants' bad faith misconduct also undermines and threatens to further undermine the Court's final judgment order with respect to the Improper Escrow Account Plaintiffs, the members of the Improper Escrow Account Sub-SubClass, and any other Class or SubClass members who become similarly situated to them by imposing upon them greater monthly mortgage payment obligations than they would have had in the absence of the Class Action Settlement Agreement approved by the Court.

248.     In light of the Court's broadly construed powers under the All Writs Act, 28 U.S.C. § 1651(a), and in equity to effectuate its judgments so as to achieve the orderly and expeditious disposition of cases, preliminary and permanent injunctive relief enjoining the bad faith violations of the Class Action Settlement Agreement and the Court's final approval order discussed herein are appropriate and should be issued, and Plaintiffs and the Class should be

CLASS ACTION COMPLAINT

awarded appropriate attorneys' fees for Defendants' bad faith breach of the Class Action Settlement Agreement, for Defendants' acting vexatiously, wantonly, or for oppressive reasons, Defendants' willful and repeated disobedience of the Court's Final Approval Order, and for the reasonable efforts of Class Counsel to preserve the fruits of a consent decree and Class Action Settlement Agreement and ensure that the mechanisms established to properly treat Settlement Class Members are functioning as intended.

## XI.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against each of the Defendants, jointly and severally, as follows:

A.     Certifying the proposed Class, SubClass and Sub-SubClass;

B.     For declaratory and preliminary and permanent injunctive relief for Plaintiffs and all Class members;

C.     For compensatory damages to Plaintiffs, SubClass and Sub-SubClass members;

D.     For consequential damages to Plaintiffs, SubClass and Sub-SubClass members;

E.     For appropriate restitution as provided under Cal. Bus. & Prof. Code § 17203 to Plaintiffs, SubClass and Sub-SubClass members;

F.     For reasonable attorneys' fees and costs for Plaintiffs and all Class members; and

G.     For such other relief as is just and proper.

Dated: December 7, 2012

BERNS WEISS LLP

By:
Jeffrey K. Berns (SBN 131351)
20700 Ventura Boulevard, Suite 140
Woodland Hills, CA 91364
Telephone:  (818) 961-2000
Facsimile:  (818) 999-1500

79

---

CLASS ACTION COMPLAINT

jberns@law111.com

—and—

Lee A. Weiss
626 RXR Plaza
Uniondale, NY 11556
Telephone: (516) 222-2900
Facsimile: (818) 999-1500
lweiss@bernsweiss.com

*Attorneys for Plaintiffs*

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury.

Dated: December 7, 2012

BERNS WEISS LLP

By:
Jeffrey K. Berns (SBN 131351)
20700 Ventura Boulevard, Suite 140
Woodland Hills, CA 91364
Telephone: (818) 961-2000
Facsimile: (818) 999-1500
jberns@law111.com

—and—

Lee A. Weiss
626 RXR Plaza
Uniondale, New York 11556
Telephone: (516) 222-2900
Facsimile: (818) 999-1500
lweiss@bernsweiss.com

*Attorneys for Plaintiffs*

80